Filed 5/7/13  In re T.T. CA2/8

# NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

## IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

## SECOND APPELLATE DISTRICT

## DIVISION EIGHT

| | |
|---|---|
| In re T.T., Person Coming Under the Juvenile Court Law. | B244810<br><br>(Los Angeles County<br> Super. Ct. No. CK82133) |
| LOS ANGELES COUNTY DEPARTMENT OF CHILDREN AND FAMILY SERVICES,<br><br>        Plaintiff and Respondent,<br><br>        v.<br><br>T.N.,<br><br>        Defendant and Appellant. | |

        Appeal from an order of the Superior Court of Los Angeles County.  Rudolph Diaz, Judge.  Affirmed.

        Donna Balderston Kaiser, under appointment by the Court of Appeal, for Defendant and Appellant.

        John F. Krattli, County Counsel, James M. Owens, Assistant County Counsel, and Jeanette Cauble, Senior Deputy County Counsel, for Plaintiff and Respondent.

_____

Mother T.N. appeals from the juvenile court order terminating her parental rights to now-five-year-old T.T. pursuant to Welfare and Institutions Code, section 366.26.[1]  Mother contends there is insufficient evidence to support the court's finding of adoptability and that the court erred in terminating parental rights before receiving an updated assessment of T.T. after he was referred to therapy.  We affirm.

FACTS AND PROCEDURAL BACKGROUND

Mother has an extensive child welfare history both in Texas and California for her other children, J.T., born in 2003, and C.T., born in 2005.  She ultimately lost her parental rights to those children, and they are not at issue in this appeal.  This dependency case, which concerns only T.T., born in 2008, was initiated in May 2010, and has been pending for over two years.  Because mother's appeal relates only to the juvenile court's September 7, 2012 order terminating her parental rights, we limit our summary of the facts and procedural background to those matters pertinent to our discussion of the order terminating parental rights.

1.      **Initial Detention and Reunification Efforts**

T.T. came to the attention of the Department of Children and Family Services in May 2010 when mother stabbed an unrelated female, R.K., in the chest, in T.T.'s presence, and was arrested for attempted murder.  The Department immediately removed T.T. from mother and filed a petition pursuant to section 300, subdivisions (b) and (g), alleging that mother's violent conduct put T.T. at risk for physical and emotional harm.  The petition also alleged that mother had unresolved mental health issues and had previously been hospitalized for treatment of her psychiatric condition. It also alleged that mother had a history of illicit drug use, and that father, R.S. (who is not a party to this appeal), failed to provide T.T. with the necessities of life.  The detention report noted that mother had two other children, who had been dependents in

---

[1]      All further undesignated section references are to the Welfare and Institutions Code.

Riverside County and Texas. There had been numerous referrals concerning her older children. For example, in 2003, mother was seen running outside, naked, wielding a knife and screaming, while holding J.T. in her arms. She was also seen hitting J.T., and she had abandoned him at a grocery store when he was just two years old.

T.T. was two years old when he was detained in shelter care. According to the jurisdiction and disposition report, mother was in custody for attempted murder, two counts of assault with a deadly weapon, burglary, and child endangerment. A felony complaint charging her with these crimes was filed on May 5, 2010. The complaint also alleged that she had a 1997 conviction in Texas for aggravated assault causing great bodily injury.

On May 3, 2010, mother and T.T. were living at a motel. Two-year-old T.T. was unsupervised, and wandered into the nearby motel room of R.K. He began playing with R.K.'s two-year-old son and four-month-old baby boy. When R.K. discovered T.T. playing with the baby, she told him not to play with the baby, and T.T. ran from the room to mother, who was outside calling his name. Mother yelled at R.K. and accused her of hurting T.T. R.K. denied harming T.T., but mother was unrelenting in her accusations, entering R.K.'s room three times, yelling and accusing her of harming T.T. Mother ultimately retrieved a knife from her motel room and stabbed R.K. multiple times. She also tried to stab R.K.'s two-year-old son. Mother was restrained by witnesses, and R.K. was taken to the hospital, where she was treated for six major stab wounds. Other motel residents believed mother to be high on PCP.

Mother was interviewed on May 6 and denied stabbing anyone. She did admit that she had been diagnosed with bipolar disorder, and that she had four previous hospitalizations in a psychiatric facility. Mother also admitted to using methamphetamine, but had not used it since 2005. She drinks alcohol when she is depressed.

On May 25, 2010, the Department investigator was unable to interview mother "due to her extreme hostile state."

3

Father's whereabouts were unknown.

T.T. was placed with foster parent D.W. T.T. was developmentally on target and not a regional center client. However, his caregiver reported that he would wake up five or six times a night screaming.

According to the police report for the stabbing incident, mother did not stab R.K.'s two-year-old son but did hit him. When he was examined at the hospital, he had visible redness and swelling on his back, resembling a right hand mark. R.K. received stab wounds in the center of her chest, causing a rib fracture; a through-and-through wound to her right shoulder; and wounds to the back of her neck, right bicep, right forearm, and in the webbing between her thumb and index finger on her left hand. She also had numerous other "nicks and scratches."

In an August 17, 2010 interim review report, the Department requested that mother not receive reunification services because she had failed to reunify with T.T.'s siblings, and because she had a conviction for a violent felony in Texas. In a last minute information to the court, the Department informed the court that it had finally located T.T.'s alleged father, and that he was in prison in Texas. The Department also requested that Interstate Compacts on the Placement of Children (ICPC) be performed for various family members in Texas for placement of T.T., including maternal grandmother, maternal great aunt, and paternal grandmother.

At the August 17, 2010 adjudication hearing, the court dismissed the drug allegations in the petition and held the allegations as to father in abeyance. The other allegations were sustained.

T.T. visited mother in jail on November 15, 2010. Both mother and T.T. cried for the entire visit. T.T. avoided eye contact with mother, did not want to sit up on the table so that mother could see him, and said "no" to all of her requests. T.T. stopped crying once the visit was over. D.W. later reported that T.T. had nightmares after the visit.

On November 17, 2010, the court appointed a guardian ad litem for mother due to her mental health condition.

The disposition hearing was continued a number of times, to obtain paternity test results for father and so that mother's guardian ad litem could be familiarized with the case. The disposition hearing was ultimately held on December 14, 2010, and the court ordered T.T. suitably placed and ordered the Department to initiate an adoptive home study. The court ordered no family reunification services, and set a permanency planning hearing.

**2.  Permanency Planning**

Initially, in the Department's April 12, 2011 section 366.26 report, D.W., who had fostered T.T. from the beginning of the dependency, was considered the prospective adoptive parent. However, she later changed her preference to legal guardianship. On April 12, 2011, T.T. was reported as "growing and developing at an age appropriate rate." He was described as "an active boy [who] enjoys playing with cars." He had a good appetite, liked vegetables, was potty trained, and was helpful at home. He could also dress himself. He was in good health with no health problems, but attended play therapy to help establish "the trust bond." He made good progress in therapy.

The ICPC was denied as to T.T.'s Texas relatives. Maternal grandmother never responded to requests to conduct a home study, maternal great aunt was deemed too old at age 82, and paternal grandmother was unaware that the ICPC was requested, and wanted to take care of T.T. only until her son (father) was released from prison and could care for T.T.

The permanency planning hearing was continued a number of times, so that other Texas relatives could be assessed as prospective adoptive parents. An ICPC for maternal aunt and uncle was initiated.

A July 12, 2011 report showed that T.T. was progressing well in play therapy and "continues to make progress with establishing trust." He continued to be in good

5

health, was not taking any psychotropic medications, and was developmentally on target. He was described as "content and comfortable in the home of" D.W. At the time the report was made, mother was confined to Patton State Hospital.

The October 12, 2011 report showed that T.T. continued to meet his developmental milestones. Although shy around strangers, T.T. was comfortable when in caregiver D.W.'s presence, and was observed as outgoing, talkative, and playful. He was also well-bonded to the other foster children living in D.W.'s home. At three years old, T.T. could recite the alphabet, was learning his primary colors, and increasing his vocabulary with new words.

Some time following the October 12, 2011 report, T.T. was placed with a new caregiver, F.B. On January 11, 2012, she reported that she was not interested in adoption. Also, the ICPC for the maternal aunt and uncle was denied.

An April 17, 2012 report showed that T.T. had completed his play therapy, and was "not exhibiting any behaviors that warrant concern for therapy services." A prospective adoptive family had been found for T.T. The family had an approved home study through a foster family agency. T.T. was observed to be doing well in his placement with F.B.

T.T. was placed with the prospective adoptive family, the C.'s, on May 29, 2012. On July 13, 2012, the family reported that they were committed to adopting T.T. They were "very nurturing, patient, understanding and loving" with T.T. T.T.'s transition to the home was at first easy, but he later started "displaying behavioral issues." Therefore, the C.'s requested that he receive therapy services.

In a July 18, 2012 last minute information for the court, the Department recommended that the C.'s be given legal guardianship over T.T. so that they could add him to their insurance to address an emergent dental problem. T.T. had been taken to a Medi-Cal dentist, but the dentist recommended pulling a tooth, whereas the C.'s dentist believed the tooth could be saved. Notwithstanding the request for immediate

6

guardianship, the C.'s remained committed to adopting T.T.  T.T. was observed to be well-bonded with the C.'s.

In a July 20, 2012 ex parte application to the court, the Department requested authorization for T.T. to receive therapy for "severe tantruming for long periods of time."  The application reflected that the C.'s are "open to helping the child but would like the assistance of a professional that specializes with foster care children and attachment issues."  The court granted the ex parte application so that T.T. could receive therapy.

The C.'s guardianship papers reflected that they sought to establish the guardianship with the goal of adoption.  Letters of guardianship issued on July 20, 2012.

In a September 5, 2012 last minute information to the court, the Department reported that T.T. had started therapy.  He had his first session on August 3, 2012, and had been regularly attending once a week since then.  His doctor said that it would take two months for T.T. to complete the initial phase of his therapy, and for the doctor to make a diagnosis and treatment plan.

**3.      The Permanency Planning Hearing (§ 366.26)**

The section 366.26 hearing was held on September 7, 2012.  The court admitted, without objection, the Department's reports for April 12, 2011; July 12, 2011; August 24, 2011; January 11, 2012; April 17, 2012; July 18, 2012; July 20, 2012, and September 5, 2012.  Mother was present for the hearing and represented by her guardian ad litem and counsel.

Mother argued that it was premature to terminate parental rights because "[y]ou can't proceed to a 26 without a report detailing the child's special needs and if its placement, indeed, will end up being a stable placement."  She argued that because T.T. was in therapy and had not received a diagnosis, it would be premature to terminate parental rights.

The Department argued that the C.'s remained committed to adopting T.T., and that there was no evidence that T.T. had special needs.

The court found T.T. adoptable by clear and convincing evidence. The court therefore terminated mother's and father's parental rights. Mother timely appealed.

**DISCUSSION**

Mother contends the juvenile court's order finding T.T. adoptable is not supported by substantial evidence. In terminating parental rights, the juvenile court must find by clear and convincing evidence that it is likely the child will be adopted. (§ 366.26, subd. (c)(1).) In making this determination, the court may rely on the assessment report and "any other relevant evidence." (*Ibid*.) The focus of the court's inquiry is on the child "and whether the child's age, physical condition, and emotional state may make it difficult to find an adoptive family." (*In re Erik P*. (2002) 104 Cal.App.4th 395, 400.) A proposed adoptive parent need not be identified and ready to adopt, but "there must be convincing evidence of the likelihood that adoption will take place within a reasonable time." (*In re Brian P*. (2002) 99 Cal.App.4th 616, 624.) In reviewing a juvenile court's adoptability finding, "we determine whether the record contains substantial evidence from which a reasonable trier of fact could find clear and convincing evidence that [the minor was] likely to be adopted within a reasonable time." (*In re Erik P*., at p. 400.) "The appellant has the burden of showing there is no evidence of a sufficiently substantial nature to support the finding or order." (*In re R.C.* (2008) 169 Cal.App.4th 486, 491.)

We find there is substantial evidence in the record that T.T. is generally adoptable. The Department's adoption assessment report, and updated supplemental reports, provided the court with sufficient information to make a decision on adoptability, and substantially complied with the statutory requirements. (See §§ 366.21, subd. (i), 366.22, subd. (c); *In re Valerie W.* (2008) 162 Cal.App.4th 1, 11.) The Department's reports showed T.T.'s good health, as well as his progress during play therapy. T.T. was not a regional center client. The Department consistently

8

reported that T.T. was a happy child, was developmentally on target, and had formed positive bonds with all of his caregivers, including the C.'s.

We reject mother's contention that the termination of parental rights and adoptability finding are premature because T.T. had recently started therapy and had not yet received a diagnosis. Mother speculates that T.T. could suffer from "reactive attachment disorder" simply because the C.'s sought "the assistance of a professional that specializes with foster care children and attachment issues" for T.T.'s tantrums. Mother also speculates that T.T.'s onset of behavioral problems, and a *potential* future diagnosis for a serious disorder, call into question whether the C.'s would remain committed to adopting him. She contends the Department's reports did not identify any *other* potential adoptive family for T.T., and did not include any evidence of the pool of potential adoptive parents seeking to adopt a child with T.T.'s characteristics.

Where, as here, a dependent child is adoptable "based on factors *in addition to a caregiver's willingness to adopt*, the . . . availability of the caregiver to adopt is not a relevant inquiry." (*In re R.C.*, *supra*, 169 Cal.App.4th at p. 493, italics added.) The Department was not required to provide evidence of "back-up" adoptive parents, and the absence of such evidence does not undermine the court's finding that T.T. was generally adoptable based upon his many positive attributes. (See § 366.21, subd. (i); *In re R.C.*, *supra*, at p. 493.)

Courts routinely affirm adoptability findings for children with problems more severe than the tantrums T.T. was displaying. (See, e.g., *In re Helen W.* (2007) 150 Cal.App.4th 71, 79-80 [children were generally adoptable despite autism and other medical issues because of positive characteristics, such as "affectionate personality traits" and ability to interact well with others].) Moreover, the fact that the C.'s were willing to adopt T.T. and their home study had been approved was further evidence T.T. would likely be adopted in a reasonable time. (*Ibid.*; *In re Sarah M.* (1994) 22 Cal.App.4th 1642, 1650.)

9

Mother relies on *In re Michael G.* (2012) 203 Cal.App.4th 580 in support of her argument that the Department's adoption assessment was inadequate, and that the trial court erred by not waiting to receive an updated psychological report concerning T.T. In *In re Michael G.*, the mother appealed from the juvenile court's order terminating her parental rights, arguing the juvenile court erred by not continuing the case in order to receive updated psychological information regarding the child, and consequently, the child's adoption assessment report was inadequate. Michael G. was seven years old, born with a positive toxicology screen for methamphetamine, and was neglected and ignored by his mother. Michael G.'s mother reported he had tried to harm her and his younger brother, and that other relatives had been unable to manage his defiant behavior. The juvenile court ordered a psychological evaluation which had been completed, but had not been received by the court at the time of the section 366.26 hearing. (*In re Michael G.*, at pp. 590-591.) The reviewing court found that the juvenile court abused its discretion when it did not briefly continue the section 366.26 hearing to receive an updated assessment of the child's adoptability based on the psychological report. (*In re Michael G.*, at p. 591.) However, the court held that any error was harmless because the child was happy, healthy, attractive, and affectionate, did well in school, and was developmentally on target. (*Id.* at pp. 591-592.)

*In re Michael G.* is inapposite because T.T. was simply receiving therapeutic services at the request of his foster parents, and the court had not ordered a psychological evaluation. Moreover, in *In re Michael G.*, the psychological evaluation had already been completed at the time of the section 366.26 hearing and was en route to the court, whereas here, a longer continuance, in an already protracted proceeding, would have been required to receive the report. Also, Michael G.'s problems were far more severe than those experienced by T.T., who by all accounts was a pleasant child who had only recently started having tantrums (not uncommon in young children). Therefore, a report from T.T.'s therapist was not required for the Department to

adequately address T.T.'s "mental[] and emotional status" in its assessment.  (§ 366.21, subd. (i)(1)(C); *In re Valerie W.*, *supra*, 162 Cal.App.4th at p. 11.)

The juvenile court was presented with substantial evidence of T.T.'s general adoptability.  Indulging all reasonable inferences in favor of the court's finding, the record is more than adequate to support the court's determination of adoptability and the corresponding termination of parental rights.  (*In re G.M.* (2010) 181 Cal.App.4th 552, 564; *In re Christopher L.* (2006) 143 Cal.App.4th 1326, 1333, 1336.)

## DISPOSITION

The order of the juvenile court terminating mother's parental rights is affirmed.

**NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS**

GRIMES, J.

WE CONCUR:

BIGELOW, P. J.

FLIER, J.

11