Filed 8/19/16  In re Emma R. CA4/3

**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FOURTH APPELLATE DISTRICT

DIVISION THREE

| | |
|---|---|
| In re EMMA R. et al., Persons Coming Under the Juvenile Court Law. | |
| ORANGE COUNTY SOCIAL SERVICES AGENCY,<br><br>    Plaintiff and Respondent,<br><br>    v.<br><br>SONIA R.,<br><br>    Defendant and Appellant. | G053318<br><br>(Super. Ct. Nos. DP024234-001, DP024234-002 & DP025915-001)<br><br>O P I N I O N |

        Appeal from orders of the Superior Court of Orange County, Gary G. Bischoff, Temporary Judge.  (Pursuant to Cal. Const., art. VI, § 21.)  Orders affirmed.

        Merrill Lee Toole and Daniel G. Rooney, under appointment by the Court of Appeal, for Defendant and Appellant.

Leon J. Page, County Counsel, Karen L. Christensen and Jeannie Su, Deputies County Counsel, for Plaintiff and Respondent.

No appearance for the Minors.

\*          \*          \*

## I.  BACKGROUND

Emma, a little girl now almost three years old, was born in September 2013, with methamphetamine in her system and a number of congenital heart defects. Her younger sister Olivia, now almost a year and a half old, was born in February 2015, with methamphetamine in her system and suffering from Incontinentia Pigmenti, a congenital condition that affects a number of bodily organs, including the brain and the eyes.  Their mother, Sonia R., now appeals from orders made March 14, 2016 terminating her parental rights to both young children.[1]  Sonia makes no argument based on her own relationship to the two children (such as the oft-litigated benefit exception of Welfare and Institutions Code section 366.26, subd. (c)(1)(B)(i)[2]), but rather presents only the issue of the "adoptability" of the two children given their congenital disabilities.

By the time of the March 14, 2016 orders of termination, a prospective adoptive couple had been located and the children had been living with them for a little more than two months, having been placed in the couple's home on January 10, 2016. For a month before the placement, the couple had regular preplacement visits in December 2015, and by the end of February, social workers had completed a preliminary assessment of the couple.  Specifically, they took a social history of the couple, checked for criminal history, checked for the involvement of other children or adults in the home, checked for any record of child abuse, ascertained the couple's motivation for adoption,

---

[1]     Emma was the subject of both an initial dependency petition (the "001" petition) filed late September 2013, and an amended petition (the "002" petition) filed in late October 2013, which explains the three case numbers in our caption for two children.  Each child is the subject of her own separate order terminating Sonia's parental rights, each made March 14, 2016.

[2]     All further statutory references are to the Welfare and Institutions Code.

2

ascertained the character of the relationship between the couple and the two children, determined the couple knows the legal and financial responsibilities of adoption and – perhaps most significantly for the case at hand – evaluated their ability to meet the children's medical and related needs. There were no problems in regard to any of these categories.

## II. DISCUSSION

A. *Adoptability: General and Special*

Before we explain the details of Sonia's thesis, we first quickly recap the basic structure of the law involving adoptability. The issue of adoptability arises in the first place because, by statute, a juvenile court must find, by clear and convincing evidence, a child to be adoptable before parental rights may be terminated. (See generally *In re Sarah M.* (1994) 22 Cal.App.4th 1642 (*Sarah M.*); *In re Helen W.* (2007) 150 Cal.App.4th 71, 79-80; see § 366.26, subd. (c)(1).[3]) In considering the issue, California's appellate courts have generally distinguished two kinds of adoptability, general and specific. (E.g., *In re Brandon T.* (2008) 164 Cal.App.4th 1400, 1408; but see *In re G.M.* (2010) 181 Cal.App.4th 552, 562 (*G.M.*).[4]) The basic paradigm then goes like this: If a child is "generally adoptable," there is no need to ask whether a prospective adoptive parent or parents have been found. It is enough he or she is generally adoptable.

---

[3] The exact statutory phrase is found in subdivision (c)(1) of section 366.26: "If the court determines, based on the assessment provided as ordered under subdivision (i) of Section 366.21, subdivision (b) of Section 366.22, or subdivision (b) of Section 366.25, and any other relevant evidence, by a clear and convincing standard, *that it is likely the child will be adopted*, the court shall terminate parental rights and order the child placed for adoption." (Italics added.) The phrase "likely to be adopted" has often been treated in the case law under the general rubric of "adoptability." (E.g., *Sarah M., supra*, 22 Cal.App.4th at pp. 1646-1648 [four usages of "adoptable" in less than three pages] and p. 1649 ["The issue of adoptability posed in a section 366.26 hearing . . . ."].)

[4] *G.M.* recognizes that many children are not so easily categorized as one or the other. The court said: "However, many adoption assessments that recommend an adoptability finding fall somewhere in the middle. They consist of a combination of factors warranting an adoptability finding, including, as in this case, the availability of a prospective adoptive parent. This is the reality we confront, notwithstanding appellate arguments that assume a child is either generally adoptable without regard to a prospective adoptive parent or specifically adoptable based solely on the availability of a prospective adoptive parent." (*G.M., supra*, 181 Cal.App.4th at p. 562.)

Or a child can be specifically adoptable – defined as "deemed adoptable based *solely* on the fact that a particular family is willing to adopt him or her." (*In re Carl R.* (2005) 128 Cal.App.4th 1051, 1061 (*Carl R.*), italics added.)

In the present case, Sonia points out that by March 14, the couple had not yet been formally approved by an adoption home study social worker. And she notes there is no indication the couple had obtained a foster care license or a license to care for special needs children. These lacunae in the approval process for the prospective adoptive couple form the core of Sonia's adoptability argument as set forth in her opening brief. She specifically reads *In re B.D.* (2008) 159 Cal.App.4th 1218 (*B.D.*) for the proposition that the absence of a foster care license and an approved home study "can constitute" legal impediments to the adoption of special needs children. ("*Can* constitute" is her phrase, but the tenor of her argument is that they necessarily "*do* constitute" legal impediments. See App. Opn. Br. at pp. 64-66.)

There are three independent reasons we reject Sonia's thesis. First is a simple one: Waiver. Sonia's counsel did not bring any issue concerning any legal impediments to the couple adopting Emma and Olivia to the attention of the trial court. "Having not raised the legal impediment question in the trial court, mother failed to properly preserve for appellate purposes her claim of trial court error." (See *G.M., supra*, 181 Cal.App.4th at pp. 563-564.)

Second, even if not waived, we disagree with the underlying assumption that Emma and Olivia are not generally adoptable. The record shows there was an earlier placement of the two girls with a couple who *would* have adopted Emma and Olivia, but only declined because they thought themselves too old.[5] That shows that Emma and Olivia are not adoptable "solely" because of their current placement.

---

[5] They told social workers, "If we were thirty years younger, yes, but not at this point. They need a younger family, someone that can grow with them."

More basically, social workers have reported that Emma and Olivia bring with them a number of characteristics that tend to be associated with general adoptability. Here is a social worker's description of Emma from July 2015: "Emma has been observed to be joyful and social as evidenced by always greeting people with a smile. The child is able to wave hello and good-bye, and can blow kisses. The child has been observed to enjoy playing with her dolls, especially her Minnie Mouse stuffed doll. She is able to walk on her own. Emma has been observed to know and use sign language such as 'more' and 'all finished.'" A month later a social worker noted "Emma is a very cute and endearing little girl with many qualities that suggest she is adoptable." By the same token, here is the description of the younger Olivia, from September 2015: "Olivia is a cute, [then] 9-month old infant with a reasonably easy temperament. She has beautiful brown eyes, brown hair, light tan skin, and an enchanting smile. She is very social and loves to be carried and rocked to sleep. . . . [¶] There are no noteworthy mental or emotional issues at this time."

In light of such evidence, we decline to accept Sonia's assumption that all children with special medical needs or disabilities can only be specially adoptable. As the *G.M.* case has noted, an adoptability determination can involve a "combination of factors" only one of which may be "the availability of a prospective adoptive parent." (*G.M., supra*, 181 Cal.App.4th at p. 562.) Here, the combination of factors is not as lopsided in favor of general adoptability as it often is; there are a number of factors which a trial court could reasonably conclude make them generally adoptable despite the fragility of their physical constitutions. These factors include the lack of mental or emotional issues, the two girls' young ages and their pleasant dispositions, and perhaps even their (to be sure, subjectively perceived) cuteness.

And third, even if not waived and even if Emma and Olivia are only specifically adoptable, the lack of a *formal* adoptive home study of the prospective adoptive couple, or their lack of various licenses are not "legal impediments" to adoption.

Under section 366.26, only a "preliminary assessment" is required of a prospective adoptive parent or parent, and here social workers touched all the bases as to the required contents of such an assessment. In rejecting a challenge similar to the one Sonia makes here, the court in *Carl R., supra,* has helpfully identified what is, and what is not, required of a preliminary assessment: "The statutory scheme requires the Agency to provide the court with a preliminary assessment of the eligibility and commitment of the prospective adoptive parents for the section 366.26 hearing. That assessment includes a social history, screening for criminal records and prior referrals for child abuse or neglect, together with an assessment of the capability of the prospective adoptive parents to meet the child's needs, and whether they understand the legal and financial rights and responsibilities of adoption. (§§ 361.5, subd. (g)(4), 366.21, subd. (i)(4), 366.22, subd. (b)(4).)" (*Carl R., supra*, 128 Cal.App.4th at pp. 1062-1063.) Thus the *Carl. R.* court actually held, in the case of a special needs child who was clearly only specially adoptable, that the prospective adoptive parents were *not* required to formulate a specific educational plan before parental rights could be terminated.[6]

Sonia gives us no authority to support the basic premise of her argument – that an "approved home study" for adoption is *required* in every case of special adoptability. Nor is it a premise we accept. The statutes just quoted do not distinguish between general and special adoptability, and it is common in cases of general adoptability not to have a home study at all. We see no reason to graft on to the statutes a requirement of a home study based on a common law distinction not recognized by the statutes.

---

[6] Carl was, at the time of termination, an eight-year-old child with both cerebal palsy and severe quadriparesis who had the "emotional maturity of an eight-month-old child." (*Carl R., supra,* 128 Cal.App.4th at p. 1058.) The prospective adoptive parents planned to home school Carl, a point on which the appellant mother based her appeal. The court rejected the idea that their plan for home schooling was a legal impediment to the adoption. (*Id.* at pp. 1065-1067.)

As to special licenses, we have been cited by Sonia to no authority that actually requires them, including *B.D.* if carefully read. *B.D.* was a case involving a sibling group of five children, the oldest being ten-year-old B.D. himself, who was old enough to actively oppose "losing his relationship with his mother." (*B.D., supra*, 159 Cal.App.4th at p. 1231.) The group ranged from three to ten years old, and included several children with various disabilities, developmental delays, significant language deficits and severe tantrums. (*Id*. at p. 1223; see p. 1238 ["several of whom had diagnosed mental handicaps"].) The social worker "strongly believed" the children had to be placed for adoption as a sibling group of five (*id*. at p. 1232). By the time of the termination hearing, the social services agency had found one family who had expressed an interest in adopting "a sibling group" – but, we note, not necessarily *that* sibling group. There was also an absence of "specific information" about this family. (*Id*. at p. 1233.) There was no adoptive home study of the family (*ibid*.) nor had any preliminary assessment been made either. (*Id*. at p. 1234, fn. 6.)

It was in that context the *B.D.* court opined that the absence of a foster care license and a preliminary assessment were "a legal impediment to adoption." (*B.D., supra*, 159 Cal.App.4th at p. 1234.) The court also noted the family interested in adopting the children had no "previous relationship" with them. (*Ibid*.) And yet, if one reads all the way to the end of the opinion, one finds the termination orders were *affirmed*, because – on an augmented record – the appellate court learned that within 180 days of the termination all five children *were* placed in an approved adoptive home, rendering the issue of adoptability moot. (*Id*. at pp. 1240-1241.)

It is enough, for purposes of the case before us, to note two points of distinction with *B.D.* First, *statutorily*, a preliminary assessment clearly is required in all cases where a prospective adoptive parent has been "identified," and in *B.D.* there wasn't such an assessment. In the case before us, by contrast, the *B.D.* court's concern about finding a prospective adoptive family without sufficient information is not applicable:

7

Here, in contrast to *B.D.*, the couple and the two girls had plenty of contact prior to the termination hearing, and a preliminary assessment *had been completed*.

B.  *Post-Appeal Motions*

A postscript is necessary, however, to complete the present case.  On July 1, 2016, the Social Services Agency filed two motions in this court.  The first motion was a request to take judicial notice of a trial court minute order dated June 22, 2016 (or alternatively take evidence on appeal of that minute order), to the effect that an adoptive home study had indeed been completed as of June 16, 2016, which was about three weeks after the opening brief had been filed (on May 25, 2016).  This motion was actually joined in by Sonia, because it allows her to embellish her argument against the adoptability of the two children.

The second motion was to dismiss the appeal as moot, since the fact of a completed home study, accordingly to the agency, obviated Sonia's sole ground of appeal.  Sonia opposed the motion to dismiss, having spotted a discrepancy in the description of the proposed adoptive couple in the trial court minute orders:  Previously, as our description of the facts illustrates, the couple had been described as a *couple*.  But in the minute order noting the completion of the home study, the minute order used the phrase "the prospective adoptive parent" – singular.  The description prompted Sonia to argue that the *couple* into whose home the children had been placed had decided not to adopt them; rather, a new adoptive parent – singular – had stepped into their place.  The perceived change underscored her argument that the children are neither generally or specially adoptable, since the implication was the couple had become just another in a series of unsuccessful placements.

But then, on July 19, 2016, in response to Sonia's argument, the agency filed a *second* request to take judicial notice (or additional evidence of same on appeal) of a minute order dated July 7, 2016, to the effect that the home study had been completed on "the prospective adoptive family" after all.  The minute order of June 16 was just

8

incorrect, at least according to the agency, in describing the couple as a parent with no "s." On July 29, Sonia filed a joinder in the agency's July 7 request, but used the opportunity to argue it *still* wasn't clear whether there were prospective adoptive parents or just one prospective adoptive parent. And *that* is where matters stood by early August, Sonia's appellate counsel having waived oral argument by not requesting it.

This post-appeal clutter does not change the result. If *In re Zeth S.* (2003) 31 Cal.4th 396 teaches appellate courts *anything*, it is to not to take evidence on appeal regarding the possible *post-appeal* failure of prospective adoptions, but rather stick to the record before the trial court. (See *id*. at pp. 407-411.) Accordingly, we deny the agency's motions to take judicial notice or additional evidence of post-appellate minute orders made by the trial court, which effectively moots the agency's motion to dismiss the appeal.

## IV. DISPOSITION

The orders appealed from are affirmed.

BEDSWORTH, ACTING P. J.

WE CONCUR:

MOORE, J.

FYBEL, J.

9