[No. G037374. Fourth Dist., Div. Three. Apr. 23, 2007.]

In re HELEN W. et al., Persons Coming Under the Juvenile Court Law.
ORANGE COUNTY SOCIAL SERVICES AGENCY, Plaintiff and
Respondent, v.
JAMIE W., Defendant and Appellant.

COUNSEL

Kate M. Chandler, under appointment by the Court of Appeal, for Defendant and Appellant.

Benjamin P. de Mayo, County Counsel, Dana J. Stits and Julie J. Agin, Deputy County Counsel, for Plaintiff and Respondent.

OPINION

SILLS, P. J.—Jamie W. appeals from the termination of parental rights to her children, Helen and Matthew. She claims there is insufficient evidence to support the finding that the children are adoptable. Alternatively, she claims the juvenile court should have found adoption is not in the children's best interests because of the benefit they derive from her relationship with them. We find no error and affirm.

## FACTS

Helen was almost three years old and her little brother Matthew was two months old when they were detained in March 2004. The police found Helen eating cigarettes and Matthew lying facedown on a dirty blanket; the apartment had dirty laundry piled in every room and numerous lighters within reach of the children. The mother was arrested for being under the influence of methamphetamine. Orange County Social Services Agency (SSA) filed a petition alleging the children were subject to the jurisdiction of the juvenile court due to their mother's failure to supervise and protect them. (Welf. & Inst. Code, § 300, subd. (b).)[1] The mother pled no contest to an amended petition, which was sustained. The children were placed in the foster home of Diane H.; the mother was provided with reunification services and monitored visits.

Both children suffered from various physical and developmental conditions that required a series of evaluations and tests during their dependency. Matthew vomited repeatedly and had problems swallowing. Testing revealed that he was suffering from infantile reflux, and medication was prescribed to help the condition. A neurologist concluded Matthew was developmentally delayed and exhibited skin lesions symptomatic of neurofibromatosis. A

---

[1] All statutory references are to the Welfare and Institutions Code.

geneticist conducted further testing and diagnosed Matthew with neurofibromatosis type 1. He recommended a followup appointment in eight to 12 months, an eye exam, and an MRI of the brain on a yearly basis to check for possible tumors. Matthew also underwent physical therapy due to significant delays in his gross motor skills and his inability to sit without support. It was later determined Matthew had a left foot abduction, and he was referred to an orthopedist.

Helen's doctors diagnosed her as having an autism spectrum disorder and possibly a bipolar disorder. The Childhood Autism Rating Scale placed Helen at 31, which is considered mildly autistic. The doctors also found Helen suffered from reactive attachment disorder and stressed the importance of Helen being placed in a structured, stable, and supportive home environment. At school, Helen was found to be significantly below average in intellectual, speech and language, and adaptive functions. Helen's teacher reported she exhibited violent behavior towards the other children in the class and towards the school's staff. She was prescribed a psychotropic medication for autism and aggressive behavior. Helen also underwent speech and physical therapy. The foster mother also reported Helen had problems with toilet training and had smeared feces on the toilet and on her face. Although her behavior improved while in the care of the foster mother, Helen exhibited poor judgment, a short attention span, inability to adapt to change, and exaggerated emotional responses.

The mother started participating in her case plan but did not follow through. In January 2006, after more than 18 months of reunification services, the juvenile court found reasonable services had been provided, no substantial progress was made towards alleviating the causes necessitating placement, and terminated the mother's services. The foster mother was willing to adopt the children.

Although the mother did not perform well on her case plan, she consistently attended the supervised visits with her children. Initially, she was permitted to visit weekly for one hour at SSA's office. In August 2004, the visits were increased to two hours weekly. By June 2005, the visits increased to seven hours a week. After reunification services were terminated, the mother's visits were decreased to once a week for two hours.

SSA reported several concerns about the interaction between the mother and the children. The mother had difficulty focusing on both the children, spent most of the visits with Helen, and was unable to protect Matthew from

Helen's sometimes violent behavior. The mother reportedly "star[ed] into space" while Helen bit her grandmother and took food from a stranger, and while Matthew walked away. The monitor and the foster mother were required to intervene at certain points during a visit to discipline and protect the children. The monitor reported the mother would not change the children's diapers unless prompted to do so and would often play with the toys herself without engaging the children at all. The foster mother and Helen's teacher reported difficulty with Helen after the mother's visits.

SSA reported extensively on the children's interest in the visits and their bond with the mother. At one visit, both children stood near the door and appeared ready to leave before the visit ended; Helen attempted to open the door to leave. On several occasions, Matthew cried and resisted going with his mother for a visit. The foster mother stated the children both expressed their desire not to go to the visitations. However, on other occasions, Helen greeted her mother with a hug and kiss, the children did not resist the visit, and they seemed happy to see her. At times, the mother fed, disciplined, changed and played with the children.

SSA compiled extensive reports for the permanent plan selection hearing recommending the termination of parental rights. SSA reported even though the children have significant medical and developmental challenges, they each exhibited likeable qualities, and the foster mother was committed to adopting both of them. Matthew was reported as being "a cute one-year old little boy who enjoys smiling and waving 'hello' to anyone who will make eye contact with him. Matthew is often found entertaining and surrounding himself with toys." Helen is "an active four-year old little girl, who likes receiving one-on-one attention to the point that, at times, she grasps for attention in a negative manner, such as pulling one's hair or spitting in one's face. With the right direction and prompting, Helen has exhibited some ability to follow directives, at which [time] it is a pleasure to interact with the child." The social worker noted that despite the children's obstacles, "the child[ren]'s [foster mother] reports that she is committed to adopting the child[ren] because she loves [them] and she wants to provide a stable, nurturing home for [them] to help [them] fulfill [their] potential." The report concluded both Matthew and Helen were adoptable.

SSA also reported, "The prospective adoptive mother is exceptionally capable of raising and caring for these children. She is an experienced parent, adoptive parent, and grandparent, and has cared [f]or many foster children who had intensive emotional and medical needs. She is highly involved with the raising and caring of her children; she provides a motivational, safe, structured, loving, nurturing, environment so that her children may reach their greatest potentials. She has reasonable expectations in regards to some of

their developmental delays and understands intuitively as well as on an educated level the effects of their neglect, drug exposure and early trauma [on] their [mental, emotional, and physical] development . . . . She has been a strong advocate in getting services to her children and foster children to begin stabilizing them physically and healing them emotionally."

At the permanent plan selection hearing, in July 2006, the mother testified that during her monitored visits with the children, Helen ran to her, wanted to be picked up, and would sometimes call her "mom." Matthew would give her hugs. The mother stated she would engage the children during the visits in the type of play that interested them. Helen especially liked to be held by the mother and wanted the majority of her attention. The mother's counsel elicited that she fed and changed the children and assisted Helen in using the restroom. At the end of each visit, both Helen and Matthew would give her a hug and say "bye." The mother explained she knows the children love her because Helen would run up to her, Matthew would blow her kisses and wave goodbye, and both children would repeat "I love you" when she said it to them. The mother felt it would be best for the children to continue a relationship with her "[b]ecause I believe in my heart that they love me and it would be hard on them to see me go. . . . I don't think the girl would understand why they can't see mommy anymore. . . . And I think it might be kind of hard on them just for me to up and stop seeing them all of a sudden."

The court found by clear and convincing evidence it was likely the children would be adopted and their bond with the mother did not make adoption detrimental to them. (§ 366.26, subd. (c)(1)(A).) The court terminated the mother's parental rights and ordered the children placed for adoption.

DISCUSSION

*The appeal was properly authorized by counsel.*

The mother's trial counsel signed and filed a timely notice of appeal. Following our administrative practice in juvenile dependency cases, this court issued an order questioning whether the mother had authorized the appeal and invited a response. A response was filed by Appellate Defenders, Inc. (ADI), the local appellate project, urging us to change our practice and accept a notice of appeal in a dependency case that is signed by counsel without questioning whether the appeal was authorized by the client. As explained below, we agree and have done so.

Our practice emanated from the line of cases beginning with *In re Alma B.* (1994) 21 Cal.App.4th 1037 [26 Cal.Rptr.2d 592]. There, the mother's trial

counsel signed and filed a notice of appeal from the juvenile court's order identifying adoption as the permanent plan for her children. The department of social services moved to dismiss the appeal based on its information that the mother had not been in contact with it or her counsel and her whereabouts had been unknown since before the appealed order was issued. The court granted the motion to dismiss, finding it could not "impute [the mother's] authorization for her trial counsel to appeal orders made after her disappearance" because she "fail[ed] to comply with her reunification plan by absconding from her drug rehabilitation program, fail[ed] to appear for the section 366.26 hearing and ultimately abandon[ed] her children . . . ." (*Id.* at p. 1043.) The court observed that these actions by the mother "belie counsel's claim that [the mother] wanted custody of the minors or intended to object to termination of her parental rights." (*Ibid.*)

*Alma B.* was followed by several cases granting motions to dismiss dependency appeals or writ petitions pursuant to California Rules of Court, former rule 39.1(b),[2] as unauthorized when there was evidence the client had disappeared or otherwise engaged in conduct inconsistent with intent to pursue the case. (*Suzanne J. v. Superior Court* (1996) 46 Cal.App.4th 785 [54 Cal.Rptr.2d 25]; *In re Sean S.* (1996) 46 Cal.App.4th 350 [53 Cal.Rptr.2d 766]; *Guillermo G. v. Superior Court* (1995) 33 Cal.App.4th 1168 [39 Cal.Rptr.2d 748].) Two other cases denied motions to dismiss the appeal when the client had not signed the notice of appeal but there was no additional evidence of a lack of intent to pursue the case. (*In re Asia L.* (2003) 107 Cal.App.4th 498 [132 Cal.Rptr.2d 733]; *In re Malcolm D.* (1996) 42 Cal.App.4th 904 [50 Cal.Rptr.2d 148].)

ADI argues that *Asia L.* and *Malcolm D.* cast doubt on the viability of the *Alma B.* line of cases. We express no opinion on that subject because it is irrelevant to the question before us, i.e., whether the lack of a client's signature on a notice of appeal in a dependency case is sufficient to justify an inquiry into the client's authorization. Having reexamined our administrative practice, we conclude it is not.

██ "An attorney's authority to represent his purported client is presumed in the absence of a strong factual showing to the contrary. [Citations.]" (*Sarracino v. Superior Court* (1974) 13 Cal.3d 1, 13 [118 Cal.Rptr. 21, 529 P.2d 53].) This presumption extends to an attorney's authority to file a notice of appeal. (*People v. Bouchard* (1957) 49 Cal.2d 438, 440 [317 P.2d 971].) Thus, in the absence of evidence affirmatively showing the attorney's lack of authorization, a notice of appeal signed by the client's attorney should raise no question about its validity. The correctness of this position is emphasized by the recent amendment to the rules governing appeals in

---

[2] All rule references are to the California Rules of Court.

juvenile cases. Before 2005, those rules provided that the rules governing appeals in criminal cases applied to juvenile appeals unless otherwise specified. (Former rule 39.) Now, the rules expressly provide that "[t]he appellant *or the appellant's attorney* must sign the notice [of appeal]." (Rule 8.400(c), italics added.) Accordingly, this court has discontinued its practice of sending out routine orders requesting evidence of authorization when a notice of appeal in a dependency case is signed by the client's attorney.[3] As in other appeals, the attorney signing a notice of appeal in a dependency case is impliedly representing to this court that his or her client has authorized the appeal.

### *The finding of adoptability is supported by substantial evidence.*

Under section 366.26, subdivision (c)(1), "[i]f the court determines . . . by a clear and convincing standard, that it is likely the child will be adopted, the court shall terminate parental rights and order the child placed for adoption." The mother argues there was insufficient evidence to support the juvenile court's finding that the children were adoptable. She contends the adoption assessment prepared by SSA lacked any "discussion of obstacles to adoption" and "[t]here had been no determination [on] . . . Helen's psychiatric or neurological conditions." We disagree.

Both children suffer from conditions that require time to determine the full severity of the issues they will face. But SSA methodically reported the children's medical, developmental, emotional, and behavioral conditions throughout the two years of their dependency. The adoption assessment included a synopsis of the children's conditions. And the foster mother—the prospective adoptive parent—accompanied the children to appointments, advocated for services, and was fully aware of their medical and psychological conditions. Nowhere in the statutes or case law is certainty of a child's future medical condition required before a court can find adoptability. (*In re Jeremy S.* (2001) 89 Cal.App.4th 514, 523–525 [107 Cal.Rptr.2d 280], disapproved on another ground in *In re Zeth S.* (2003) 31 Cal.4th 396, 413–414 [2 Cal.Rptr.3d 683, 73 P.3d 541].)

The mother contends the juvenile court impermissibly relied upon *only* the foster mother's intention to adopt in finding the children adoptable. But the record includes additional evidence to support the adoptability finding. SSA's

---

[3] Notices of intent to file a petition challenging an order setting a hearing under section 366.26 "must be signed by the party intending to file the petition or, if filed on behalf of the minor, by the attorney of record for the minor. The reviewing court may waive this requirement for good cause on the basis of a declaration by the attorney of record explaining why the party could not sign the notice." (Rule 8.450(e)(3).)

report included details of the children's appealing characteristics, including their young ages, affectionate personality traits, positive interactions with others, and attractive physical appearances, that made adoption likely. Furthermore, a prospective adoptive parent serves as evidence a child is likely to be adopted within a reasonable time either by the prospective adoptive parent or some other home. (*In re Sarah M.* (1994) 22 Cal.App.4th 1642, 1649–1650 [28 Cal.Rptr.2d 82].)

■ Even if the juvenile court had relied solely on the foster mother's willingness to adopt, the adoptability finding would be supported by clear and convincing evidence. When a child is deemed adoptable only because a particular caretaker is willing to adopt, the analysis shifts from evaluating the characteristics of the child to whether there is any legal impediment to the prospective adoptive parent's adoption and whether he or she is able to meet the needs of the child. (*In re Carl R.* (2005) 128 Cal.App.4th 1051, 1062 [27 Cal.Rptr.3d 612].) The adoption assessment report included ample evidence that the foster mother would face no legal impediment to adoption and would excel, as she had for over two years, at meeting the children's needs throughout their lives. The report detailed the foster mother's social history and commitment to the permanent plan of adoption. The report also explained she had no criminal record, was financially secure and emotionally mature, and fully understood the responsibilities of adoption.

### *The benefit exception does not apply to obviate adoption.*

The mother argues the court erred in finding adoption as the permanent plan because the children would benefit more from maintaining their relationship with her than they would from being adopted. (§ 366.26, subd. (c)(1)(A).) Again, we disagree.

■ After a child is found adoptable, the termination of parental rights and adoption is considered the best mechanism to ensure the child has "a placement that is stable, permanent, and that allows the caretaker to make a full emotional commitment to the child. [Citation.]" (*In re Marilyn H.* (1993) 5 Cal.4th 295, 306 [19 Cal.Rptr.2d 544, 851 P.2d 826]; see also *In re Cory M.* (1992) 2 Cal.App.4th 935, 952 [3 Cal.Rptr.2d 627].) The juvenile court can avoid terminating parental rights to an adoptable child only if it finds a compelling reason that termination would be detrimental to the child due to one of several circumstances. (§ 366.26, subd. (c)(1)(A)–(F).) The mother argues adoption would be detrimental to her children because she has "maintained regular visitation and contact with the child[ren] and [they] would benefit from continuing the relationship." (§ 366.26, subd. (c)(1)(A).)

■ The parent contesting the termination of parental rights bears the burden of showing both regular visitation and contact and the benefit to the

child in maintaining the parent-child relationship. (*In re Angel B.* (2002) 97 Cal.App.4th 454, 466 [118 Cal.Rptr.2d 482]; *In re Tabatha G.* (1996) 45 Cal.App.4th 1159, 1164 [53 Cal.Rptr.2d 93]; *In re Autumn H.* (1994) 27 Cal.App.4th 567, 574 [32 Cal.Rptr.2d 535].) To overcome the strong policy in favor of terminating parental rights and to fall within section 366.26, subdivision (c)(1)(A)'s purview, the parent must show more than "frequent and loving contact" (*In re Beatrice M.* (1994) 29 Cal.App.4th 1411, 1418 [35 Cal.Rptr.2d 162]), and be more to the child than a mere "friendly visitor or friendly nonparent relative." (*In re Angel B., supra,* 97 Cal.App.4th at p. 468.) The parent must show the parent-child bond is a "substantial, positive emotional attachment such that the child would be greatly harmed" if parental rights were terminated. (*In re Autumn H., supra,* 27 Cal.App.4th at p. 575.)

In deciding whether the exception applies, the juvenile court must balance "the strength and quality of the natural parent/child relationship" against "the security and the sense of belonging a new family would confer." (*In re Autumn H., supra,* 27 Cal.App.4th at p. 575.) The factors to be considered include: "(1) the age of the child, (2) the portion of the child's life spent in the parent's custody, (3) the positive or negative effect of interaction between the parent and the child, and (4) the child's particular needs." (*In re Angel B., supra,* 97 Cal.App.4th at p. 467, fn. omitted.)

██ It is clear from the record that the mother maintained regular visits with Helen and Matthew, but it is also clear that sufficient evidence supports the juvenile court's conclusion the parent-child relationship did not rise to the level required under the benefit exception. The children are young. Helen has spent over half her life with the foster mother, and Matthew has lived virtually his entire life with her. It is the foster mother who has provided the children with food, shelter, and care for over two years.

Nothing in the record indicates that Helen and Matthew have any needs that can be met only by the mother. Both the foster mother and Helen's teacher reported difficulty in controlling Helen after the mother's visits, and there are indications that the children did not always enjoy their visits with her. The mother clearly loved her children and believed they loved her; she fed and changed them during visits, and sometimes they would call her "Mom." But this is simply not enough to outweigh the sense of security and belonging an adoptive home would provide.

## DISPOSITION

The judgment terminating parental rights is affirmed.

Rylaarsdam, J., and Aronson, J., concurred.