Filed 7/30/14  In re R.H. CA4/1

## NOT TO BE PUBLISHED IN OFFICIAL REPORTS

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

## COURT OF APPEAL, FOURTH APPELLATE DISTRICT

## DIVISION ONE

## STATE OF CALIFORNIA

| | |
|---|---|
| In re R.H., a Person Coming Under the Juvenile Court Law. | D065686 |
| SAN DIEGO COUNTY HEALTH AND HUMAN SERVICES AGENCY, | |
| Plaintiff and Respondent, | (Super. Ct. No. NJ14510A) |
| v. | |
| MELISSA M., | |
| Defendant and Appellant. | |

APPEAL from a judgment of the Superior Court of San Diego County, Michael

M. Imhoff, Commissioner.  Affirmed.

Valerie N. Lankford, under appointment by the Court of Appeal, for Defendant

and Appellant.

Thomas E. Montgomery, County Counsel, John E. Philips, Chief Deputy County

Counsel, and Lisa M. Maldonado, Deputy County Counsel, for Plaintiff and Respondent.

Melissa M. appeals the judgment terminating her parental rights to her daughter, R.H. Melissa contends the juvenile court erred by declining to apply the beneficial relationship and sibling relationship exceptions (Welf. & Inst. Code, § 366.26, subd. (c)(1)(B)(i), (v))[1] to termination of parental rights. We affirm.

BACKGROUND

R.H. was born in November 2010, when Melissa was 16 years old and a juvenile court dependent. In September 2011, the San Diego County Health and Human Services Agency (the Agency) filed a dependency petition for R.H. The petition, as later amended, alleged that on September 3, R.H. was exposed to a violent confrontation between Melissa and maternal great-aunt Maria D. Melissa punched Maria in the face, knocked a telephone from her hand, pushed her to the floor, kicked her in the stomach and kicked her in the chest and/or upper thighs. Melissa had threatened Maria and her minor children. This included a threat to burn down the house where Maria, her children, Melissa and R.H. lived.

R.H. was detained in Polinsky Children's Center and in a foster home. In November 2011, she was moved to a second foster home. In December, she was moved to a third foster home. In January 2012, the court made a true finding on the petition, ordered R.H. placed in foster care and ordered reunification services. In April, Melissa turned 18 and became a nonminor dependent of the juvenile court. From April to May, R.H. lived in a respite foster home. In May, she was returned to her third foster home.

_____

[1] All further statutory references are to the Welfare and Institutions Code.

2

In November 2012, Melissa gave birth to her second child, J.H. J.H. was detained at birth and returned to Melissa two weeks later. In May 2013, the court restored physical custody of R.H. to Melissa.

In June 2013, the Agency filed a supplemental petition (§ 387) for R.H. The petition alleged Melissa had not complied with services. Melissa had not made R.H. available to be seen by the social worker, the court appointed special advocate (CASA) and other service providers. Melissa had recently pulled family friend Mary by the hair and hit her.

The court ordered the issuance of a protective custody warrant for R.H. and J.H. In June 2013, R.H. was detained in her third foster home and J.H. was detained in a different foster home. In August, the court made a true finding on the section 387 petition. In September, R.H. was again returned to Melissa. Within two weeks, Melissa engaged in three incidents of domestic violence, and R.H. was returned to her third foster home. At the section 387 dispositional hearing in September, the court ordered that R.H. remain placed in foster care, terminated Melissa's reunification services and set a section 366.26 hearing.

The section 366.26 hearing took place in March 2014. At the time of the hearing, R.H. was still living in her third foster home, and the foster parents wished to adopt her.

## THE BENEFICIAL RELATIONSHIP EXCEPTION

If a dependent child is adoptable,[2] the court must terminate parental rights at the section 366.26 hearing unless the parent proves the existence of a statutory exception. (§ 366.26, subd. (c)(1); *In re Helen W.* (2007) 150 Cal.App.4th 71, 80-81.)  One exception exists if "[t]he parents have maintained regular visitation and contact with the child and the child would benefit from continuing the relationship."  (§ 366.26, subd. (c)(1)(B)(i).)  A beneficial relationship "promotes the well-being of the child to such a degree as to outweigh the well-being the child would gain in a permanent home with new, adoptive parents."  (*In re Autumn H.* (1994) 27 Cal.App.4th 567, 575.)  If terminating parental rights "would deprive the child of a substantial, positive emotional attachment such that the child would be greatly harmed, the preference for adoption is overcome . . . ."  (*Ibid.*)  The existence of a beneficial relationship is determined by considering "[t]he age of the child, the portion of the child's life spent in the parent's custody, the 'positive' or 'negative' effect of interaction between parent and child, and the child's particular needs . . . ."  (*Id.* at p. 576.)  Examining the evidence most favorably to the judgment (*ibid.*), we conclude substantial evidence supports the court's findings Melissa maintained regular and consistent contact with R.H.; it was not in "[R.H.'s] best interest[s] to promote or facilitate a mother-child relationship;" and whatever benefit R.H. derived from contact with Melissa was "greatly outweighed by [R.H.'s] need for stability in placement, which can only be achieved through adoptive placement."

---

2       Melissa does not contest the adoptability finding.

By March 2014, five-year-old R.H. had been in eight placements and had lived with her third foster family for a total of more than 18 months. R.H. had been in Melissa's care for a total of approximately 10 and one-half months and had been removed from Melissa's care three times. R.H. had lived with Melissa for the first nine and one-half months of her life; for approximately six and one-half weeks in early 2013; and for 11 days in late 2013.

Visitation varied between supervised and unsupervised. R.H. ran to Melissa when visits began. During visits, Melissa sometimes ignored R.H. When visits ended, R.H. separated from Melissa easily. During visits, Melissa sometimes exhibited poor parenting skills. For example, at one visit she gave R.H. food that was a choking hazard. On another occasion, Melissa "snatched" R.H. from the foster parent. At a third visit, the social worker called the police after Melissa "blocked [R.H.] in a corner, refusing to allow her to go back to the [visitation] monitor."

R.H. had developmental delays and behavioral problems. The foster parents "actively sought out and then participated in services to benefit [R.H.'s] developmental and other needs." As a result, R.H.'s behavior, speech, motor skills and attentiveness improved. After visits with Melissa, R.H.'s night terrors worsened. R.H.'s treatment team believed her anxiety would not lessen until she was allowed the stability and security she needed.

## THE SIBLING RELATIONSHIP EXCEPTION

Section 366.26, subdivision (c)(1)(B)(v), provides an exception to termination of parental rights when termination would substantially interfere with the child's sibling

5

relationship and the severance of the relationship would be so detrimental to the child to outweigh the benefits of adoption. (*In re L.Y.L.* (2002) 101 Cal.App.4th 942, 951-953; § 366.26, subd. (c)(1)(B)(v).) The juvenile court must "balance the beneficial interest of the child in maintaining the sibling relationship, which might leave the child in a tenuous guardianship or foster home placement, against the sense of security and belonging adoption and a new home would confer." (*In re L.Y.L.*, *supra*, at p. 951, citing *In re Autumn H.*, *supra*, 27 Cal.App.4th at p. 575.) Factors to be considered include whether the children were raised in the same home; whether they shared significant common experiences or have existing close and strong bonds; and whether ongoing contact is in the child's best interests, including his or her long-term emotional interests, as compared to the benefits of adoption. (§ 366.26, subd. (c)(1)(B)(v).) "[T]he application of this exception will be rare, particularly when the proceedings concern young children whose needs for a competent, caring and stable parent are paramount." (*In re Valerie A.* (2007) 152 Cal.App.4th 987, 1014.) Examining the evidence most favorably to the judgment, we conclude substantial evidence supports the court's finding Melissa did not meet her burden of proving the exception. (*In re L.Y.L.*, *supra*, at pp. 947, 952.) The court found termination of parental rights would not cause a substantial interference with the sibling relationship and, even if it did, R.H.'s need for stability outweighed her "close and strong bond" with J.H. The court concluded "[c]onsidering [R.H.'s] long-term emotional interests, ongoing contact would not be in [R.H.'s] best interest[s] as compared to the benefit of legal permanence through adoption."

R.H. and J.H. lived together for just six weeks and saw each other during some of Melissa's visits. R.H. called J.H. "baby" and "Jos" and liked to play with her. R.H.'s and J.H.'s foster parents were longtime friends and saw each other regularly. R.H.'s foster parents were committed to maintaining R.H.'s relationship with J.H., whether J.H. remained in her foster home or returned to Melissa's care. As noted above, R.H. needed the stability and security of adoption.

## DISPOSITION

The judgment is affirmed.

McDONALD, J.

WE CONCUR:

BENKE, Acting P. J.

McINTYRE, J.