Filed 8/26/20  In re O.G. CA2/5

## NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION FIVE

| | |
|---|---|
| In re O.G., a Person Coming Under Juvenile Court Law. | B303106 |
| _____ | (Los Angeles County Super. Ct. No. DK08600C) |
| LOS ANGELES COUNTY DEPARTMENT OF CHILDREN AND FAMILY SERVICES, | |
| Plaintiff and Respondent, | |
| v. | |
| K.G., | |
| Defendant and Appellant. | |

APPEAL from an order of the Superior Court of Los Angeles County, D. Brett Bianco, Judge.  Affirmed.

Maryann M. Goode, under appointment by the Court of Appeal, for Defendant and Appellant.

Mary C. Wickham, County Counsel, and Kim Nemoy, Acting Assistant County Counsel, for Plaintiff and Respondent.

_____

**INTRODUCTION**

Mother appeals from the juvenile court's termination of her parental rights to her medically fragile five-year-old. Mother contends the evidence did not support the trial court's finding that the child was likely to be adopted. She also argues the juvenile court and Los Angeles County Department of Children and Family Services (DCFS) failed to comply with the Indian Child Welfare Act (ICWA). (25 U.S.C. § 1901 et seq.)

We conclude substantial evidence supported the juvenile court's finding that the child, who had lived in a medical facility since infancy, would be adopted by a family that had a positive history of adopting medically fragile children and demonstrated means to care for the child. We also conclude the juvenile court and DCFS conducted an adequate inquiry under ICWA, and the court's ICWA inapplicability finding was supported by substantial evidence. We affirm the termination of parental rights.

*FACTUAL AND PROCEDURAL BACKGROUND*

Mother and father have three children (born 2004, 2011, and 2014). On December 2, 2014, the children were taken into protective custody. On December 8, 2014, DCFS filed Welfare and Institutions Code section 300 petitions against the parents, alleging drug use, emotional abuse of the children by father, and neglect.[1] On April 15, 2015, the court sustained the petition. During the pendency of this case, the parents divorced. Mother eventually reunified with the two older children,[2] and on

---

[1]    All subsequent statutory references are to the Welfare and Institutions Code unless indicated otherwise.

[2]    Father has not appealed the order terminating parental rights.

2

February 23, 2017, the court terminated jurisdiction over the two older children. Mother was awarded sole legal and physical custody and father monitored visitation.[3] Neither parent was able to reunify with the child born in 2014 (son) and reunification services were terminated on July 26, 2017. Only son, who was two months old when dependency proceedings commenced, is at issue in this appeal.

## 1. Son's Medical Condition

As an infant, son was diagnosed with Crouzon's Syndrome. This was later re-diagnosed as Pfeiffer Syndrome Type II, a genetic illness that resulted in severe structural abnormalities of son's face and skull, fluid buildup in his brain, bulging eyes, and severe developmental disability. The syndrome has required multiple surgeries in his young life and will likely require future surgery. Son has been dependent on a g-tube for feeding. Doctors reported that son likely would have a shortened lifespan. In a report filed with the court, DCFS summarized the syndrome as follows:

> " 'Pfeiffer syndrome type II is characterized by a more severe form of craniosynostosis (Cloverleaf skull) with more severe hand and foot anomalies and additional malformations of the limbs [than Crouzon's Syndrome]. In infants with Pfeiffer syndrome type II, premature closure of the fibrous joints (cranial sutures) between several bones in the skull causes the skull to have a "tri-lobed" appearance . . . Characteristic craniofacial features associated with Pfeiffer syndrome type II may include

[3] By this point in time, mother had given birth to her fourth child who remained in her custody and is not subject to this appeal.

3

an abnormally high, broad forehead; severe protrusion of the eyes (ocular proptosis); an unusually flat middle portion of the face (midface hypoplasia); a "beak-shaped" nose; and downwardly displaced ears.  Affected infants may also exhibit abnormal fixation and lack of mobility (ankylosis) of the elbow joints and/or, in some cases, various malformations of certain internal organs in the abdomen (visceral anomalies).  In addition, infants with Pfeiffer syndrome type II often experience impaired mental development and neurological problems due to severe involvement of the brain, and/or hypoxia due to problems with breathing.  Without appropriate treatment, the physical abnormalities associated with the disorder may lead to life-threatening complications during infancy[.]' (National Organization for Rare Disorders, 2015.)"

Son had spent almost all of his life in hospital settings and needed ongoing, round-the-clock, intensive medical care.  In addition to Pfeiffer Syndrome Type II, he was diagnosed with failure to thrive, g-tube dependency, a history of cerebellar tonsillar ectopy, and other medical disorders.  Mother visited (though inconsistently) and was an active participant in son's care, but struggled to complete the medical education necessary to care for son while at the same time parenting her two older children.[4]  She accepted that DCFS was looking for an adoptive

_____

[4]    The trial court said that mother had made "valiant efforts" to obtain necessary medical knowledge although it ultimately concluded mother was unable to care for son.

4

placement for son and stated she would still like to visit him when possible.

## 2. *Adoptive Family Identified*

For nearly two years, DCFS searched for an adoptive home. The juvenile court scheduled multiple permanency hearings, only to continue them because no prospective adoptive parent could be found. On April 25, 2019, DCFS located a prospective adoptive family, the Cs, who had a history of adopting special-needs children. Mr. and Ms. C, who had been married for seven years, were raising Ms. C's 13-year-old biological daughter and three adopted medically-fragile sons, one of whom was also adopted by Mr. C. Ms. C also had two adult biological children who did not reside in the home. The Cs had a substantial income and were able to meet the family's financial needs and provide for the children's medical care. They were highly motivated to adopt son and provide him a loving and safe home. Their prior adoptions were through DCFS, and the Cs understood the responsibilities associated with adoption.

After DCFS completed pre-placement steps and assessment of the home and family, the Cs and son began pre-adoptive visits in July 2019. Son became closely attached to the Cs. The Cs were committed to adopting son and willing to allow ongoing contact between him and mother and his siblings in order to maintain son's familial connection. Mother was in agreement with the plan as "it would be like [son] has 2 families that care for him." Son was placed in the Cs' home on October 5, 2019. Mother desired a collaborative effort between the two families, and she requested a referral to the Consortium for Children.[5]

---

[5] It appears mother thought she could establish through the Consortium some agreement between the parties for visitation.

5

The last of several section 366.26 hearings was held on November 20, 2019. Mother's trial attorney objected to the termination of parental rights. She also requested a continuance since the case had not yet been referred to the Consortium for Children.

The court proceeded with the permanency hearing. The court found clear and convincing evidence of the child's adoptability and terminated parental rights. The court never expressly stated whether son was generally or specifically adoptable, but the court designated the child's current caretakers, Mr. and Mrs. C, as the child's prospective adoptive parents. In making its adoptability ruling, the court stated son had been with the Cs for six months, the Cs had expressed a commitment to adoption, and the Cs had taken at least one step to facilitate the adoptive process.[6]

### 3.   *ICWA Inquiry and Findings*

As mother contests the court's ICWA inquiry and findings, we address the chronology of the ICWA facts separately here.

On December 2, 2014, both parents denied Native American ancestry to the social worker. Six days later at the detention hearing, father filled out the ICWA-020 form claiming Rappahannock ancestry through the paternal great-great-grandmother. He also told the court at the hearing the paternal great-great-grandmother was 100 percent Rappahannock Indian. The court ordered DCFS to investigate the claim and to send out notices if appropriate.

On December 23, 2014, the social worker re-interviewed the parents and asked father about his Native American ancestry. Father stated: " 'my paternal great grandmother['s]

---

[6]   Son had actually been living with the Cs for six and a half weeks, and had known the Cs for approximately five months.

6

. . . mother was somehow involved with the Rappahannock Indian Tribe, but I have no other information. Actually, now that I think of it, we do not have any American Indian Heritage. Just document that in there. There is no American Indian Heritage. There is none. I don't know why I said that in Court, but maybe it has something to do with the advice that I received from my lawyer, but not sure. All I can tell you now is that there is no known American Indian blood in my ancestry. I apologize for the confusion.' " At the social worker's insistence, father provided the names and information for several family members including the paternal grandparents, great-grandparents and great-great-grandparents.

The social worker unsuccessfully tried to locate the Rappahannock tribe in the Federal Registry. The social worker reported that he also tried to search the tribe through a Google online search to no avail. In February 2015, DCFS advised the court the Rappahannock Indian Tribe was not listed on the Federal Registry.[7] On January 19, 2018, the juvenile court found no reason to believe that the ICWA applied. The court did not state the basis for its finding.

### DISCUSSION

Mother argues the court erred in finding son adoptable and in concluding ICWA did not apply without further inquiry of the paternal relatives. We address each argument in turn.

1.  *Substantial Evidence Supports the Court's Adoptability Finding*

Mother argues insufficient evidence supported the trial court's finding of adoptability. Whether a child is likely to be

---

[7]     DCFS efforts to identify the Rappahannock Tribe took place in 2014 and early 2015. Apparently, the tribe became federally recognized in January 2018.

adopted is the "pivotal question" under section 366.26. (*In re Tamneisha S.* (1997) 58 Cal.App.4th 798, 804.) In order for a juvenile court to terminate parental rights under section 366.26, the court must find by clear and convincing evidence that it is likely that the child will be adopted. (§ 366.26, subd. (c)(1).) We review whether there was substantial evidence to support a finding of adoptability under the heightened standard of review set by our Supreme Court. (*Conservatorship of O.B.* (2020) 9 Cal.5th 989, 1005.) When "presented with a challenge to the sufficiency of the evidence associated with a finding requiring clear and convincing evidence, the [appellate] court must determine whether the record, viewed as a whole, contains substantial evidence from which a reasonable trier of fact could have made the finding of high probability demanded by this standard of proof." (*Ibid.*)

When, as here, the child satisfies criteria so that he or she is considered difficult to place for adoption, the dependency court may terminate parental rights only if the court finds the child is "specifically" adoptable, meaning adoptable by an identifiable person. (*In re R.C.* (2008) 169 Cal.App.4th 486, 494 [specific adoptability applies due to child's age, poor physical health, physical disability, or emotional instability].) To find a child specifically adoptable, the court must identify prospective adoptive parents who intend to adopt the child if the court frees the child for adoption. " 'When a child is deemed adoptable only because a particular caretaker is willing to adopt, the analysis shifts from evaluating the characteristics of the child to whether there is any legal impediment to the prospective adoptive parent's adoption and whether he or she is able to meet the needs of the child.' " (*Ibid.*) If a legal impediment exists that bars the prospective adoptive parents from adopting the children, the court must not terminate parental rights—to do so risks making

8

the children legal orphans if no other adoptive parents step forward. (*In re Carl R.* (2005) 128 Cal.App.4th 1051, 1061–1062 (*Carl R.*).)

On appeal, mother concedes there were no legal impediments to adoption by the Cs. The record shows Ms. C had no disqualifying criminal or child-abuse history. Though Mr. C had several old traffic citations and two offenses for driving while under the influence in 1998 and 2014, DCFS reviewed the relevant court and police records, noted Mr. C successfully completed all court requirements, and found that Mr. C posed no safety concerns. On this information, DCFS granted him a criminal exemption to clear him for son's adoption. The record also reflects that the five state-certified and licensed home-health nurses who provided care for the C family – two of whom were hired to work directly with son – found no disqualifying issues. Ms. C's adult adopted son, who also resided in the family home, had no disqualifying criminal history.

Mother argues the court's adoptability finding was premature and based on a misgiving that the child had been living with the Cs for over six months. Mother asserts son barely knew the Cs. Mother correctly points out the child was placed with the Cs six and a half weeks, not six months, prior to the order terminating parental rights. This misapprehension notwithstanding, we conclude substantial evidence supports the adoptability finding.

The Cs had been interested in adopting son since April 2019, and had "many preplacement visits with [son]" prior to his placement in their home on October 5, 2019. Contrary to mother's assertion that son did not know the Cs, the ongoing pre-placement visits and eventual placement in the Cs' home created a close attachment between son and the Cs. From the time they were told about son in April 2019, until the termination of

9

parental rights in November 2019, the Cs, who had previously adopted three special-needs, medically-fragile children through DCFS, never wavered in their commitment to adopt son.

That the Cs appeared uniquely qualified for this adoption – or that son was specifically adoptable by the Cs, to use the legal standard – was supported by substantial evidence. They had the financial wherewithal to provide him round-the-clock care to address his Pfeiffer Syndrome, failure to thrive, g-tube dependency, history of cerebellar tonsillar ectopy, and cranial issues. They were highly motivated to adopt son in order to provide him a loving and safe home. The Cs had already proved they were capable of caring for son because they were already caring for three other medically fragile children.

In her argument that insufficient evidence supported the adoptability finding, mother refers us to three cases: *In re Helen W.* (2007) 150 Cal.App.4th 71 (*Helen W.*), *Carl R., supra,* 128 Cal.App.4th 1051, and *In re Valerie W.* (2008) 162 Cal.App.4th 1 (*Valerie W.*). None of the cases is apt and *Helen W.* and *Carl R.* actually affirm a finding of adoptability.

In *Helen W.*, the appellate court affirmed that the child was adoptable even though the severity of the children's medical and psychological conditions were not yet known. The appellate court concluded that their foster mother of two years was fully aware of their conditions and was willing to adopt. (*Helen W., supra,* 150 Cal.App.4th at pp. 79-80.) In *Carl R.*, the child had lived in a medical facility from infancy until he was freed for adoption at eight years old. (*Carl R., supra,* 128 Cal.App.4th at p. 1058.) The *Carl R.* court concluded that the adoptive family's history of providing a good home for disabled children and their resources to care for the child supported the finding of specific adoptability. (*Id.* at pp. 1064-1065.) In our view these cases support the juvenile court's adoptability finding. Son's condition was well-

10

documented, the Cs had a history of raising special-needs children, they had a history of adopting children through DCFS, and they had the means to meet son's needs—employing five home-health nurses, two of whom exclusively worked with son.

In *Valerie W.*, the appellate court found the adoptability finding unsupported and reversed. But the facts are quite different from the present appeal. The prospective adoptive parents were not provided with the results of genetic and neurological testing of the child, testing that had been recommended because of seizures and other medical issues. The juvenile court also failed to consider whether there were legal impediments to the planned adoption by the child's caregiver and her adult daughter. (*Valerie W., supra,* 162 Cal.App.4th at pp. 13-14.) In contrast, the record here does not reveal any withheld medical tests or other medical information. Rather, the Cs appeared to be well-aware of son's extensive medical conditions and his needs to the point that they had already hired two nurses to care exclusively for him. There were no legal impediments to adoption.

We conclude the record does not support mother's stated concerns for a failed adoption. What the record reflects is that after five years of living in a medical facility, son now had a chance for a home life with family that had both the expertise and the commitment to care for him.

### 2. *DCFS and the Court Satisfied ICWA*

Mother argues the order terminating parental rights must be reversed because DCFS and the court failed to investigate father's Rappahannock heritage. "We review a court's ICWA findings for substantial evidence." (*In re Austin J.* (2020) 47 Cal.App.5th 870, 885 (*Austin J.*).)

"Under California law, the court and county child welfare department 'have an affirmative and continuing duty to inquire

11

whether a child,' who is the subject of a juvenile dependency petition, 'is or may be an Indian child.' [Citations.] The child welfare department's initial duty of inquiry includes 'asking the child, parents, legal guardian, Indian custodian, extended family members, others who have an interest in the child, and the party reporting child abuse or neglect, whether the child is, or may be, an Indian child and where the child, the parents, or Indian custodian is domiciled.' (§ 224.2, subd. (b).)" (*Austin J., supra,* 47 Cal.App.5th at p. 883.) DCFS is required to "make further inquiry regarding the possible Indian status of the child" if it has "reason to believe" the child is an Indian child (§ 224.2, subd. (e)), and give notice to the tribe where it has "reason to know" the child is an Indian child (25 U.S.C. § 1912, subd. (a); § 224.2, subd. (f)).

Here, father initially denied Indian heritage, then later stated the paternal great-great-grandmother was of the Rappahannock tribe, and ultimately changed his statement and steadfastly denied Indian heritage. We conclude that, after the father's recantation, neither the court nor the social worker knew or had reason to know that son might be an Indian child. The information available did not meet the "reason to know" criteria set forth in the federal regulations and the California ICWA statutes. (See 25 U.S.C. § 1912, subd. (c); § 224.2, subd. (d).) No one had unequivocally informed the court or DCFS that son was an Indian child. There was no suggestion son had ever lived on a reservation or had been a ward of a tribal court, and there was no indication that the child or his parents possessed a tribal identification card. (See 25 C.F.R. § 23.107, subds. (c)(1), (3)-(6); § 224.2, subd. (d)(1), (3)-(6).) Instead, the court reasonably found credible father's adamant denial of Native American ancestry. Mother did not testify otherwise. Substantial evidence supported the trial court's ICWA finding.

Mother likens the present case to *In re Gabriel G.* (2012) 206 Cal.App.4th 1160, 1167-1168 (*Gabriel G.*) in arguing further inquiry was required. There, the father's unsigned Parental Notification of Indian Status (ICWA-020) form indicated that the paternal grandfather " 'is or was a member' " of the Cherokee tribe. (*Id.* at p. 1163.) However, a social worker later reported that the father had been interviewed and stated he had no Indian heritage. (*Id.* at p. 1164.) The report did not explain whether the social worker probed the discrepancy or asked the father to elaborate on the information in his ICWA-020 form. (*Ibid.*)

The *Gabriel G.* court found: "[T]he social worker's representation in the [DCFS] report did not provide any specifics regarding the inquiry he made of father as to his Indian heritage. For example, the social worker did not state whether he limited his inquiry to father's registration in a federally recognized tribe or inquired about the registration status of father's relatives. . . . On the record before us, we cannot discern whether father meant to convey that while he was not a registered member of a Cherokee tribe, his own father was registered. [¶] At a minimum, a conflict in the evidence exists." (*Gabriel G., supra,* 206 Cal.App.4th at p. 1167.) The appellate court concluded the social worker and juvenile court had a duty of further inquiry, and that notice was required to be sent to the Cherokee tribes in the absence of information reliably rebutting father's Cherokee heritage. (*Id.* at p. 1168.)

To the extent that Gabriel holds that any conflict in the ICWA evidence automatically triggers a duty of further inquiry, we respectfully disagree with the decision. But our facts also differ. Here, the social worker specifically followed up with father asking about his Native American ancestry. Father, whose words are transcribed in DCFS records filed with the court, stated he was "an African American male of Black descent"

13

and expressly denied any Native American ancestry, stating: " 'we do not have any American Indian Heritage. Just document that in there. There is no American Indian Heritage. There is none. I don't know why I said that in Court, but maybe it has something to do with the advice that I received from my lawyer, but not sure. All I can tell you now is that there is no known American Indian blood in my ancestry. I apologize for the confusion.' "

This case more closely resembles *In re Jeremiah G.* (2009) 172 Cal.App.4th 1514 (*Jeremiah G.*). There, a father vaguely stated at a hearing that he "might have some Indian heritage" but needed to do further research. (*Id.* at p. 1516.) Three weeks later, he told the agency and the court he did not have Indian heritage. Upon further inquiry from the court, the father's counsel indicated he initially thought he might have Indian ancestry but later retracted the claim. (*Ibid.*) On that record, the appellate court affirmed the juvenile court's finding that ICWA did not apply. (*Ibid.*)

With a similar record, we agree that the trial court did not err in finding that ICWA did not apply.

### *DISPOSITION*

The order terminating parental rights is affirmed.

RUBIN, P. J.

WE CONCUR:

MOOR J.

KIM, J.

14