Filed 4/8/21  In re A.D. CA4/1

**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

COURT OF APPEAL, FOURTH APPELLATE DISTRICT

DIVISION ONE

STATE OF CALIFORNIA

|  |  |
|---|---|
| In re A.D., a Person Coming Under the Juvenile Court Law. | D078196 |
| SAN DIEGO COUNTY HEALTH AND HUMAN SERVICES AGENCY,  Plaintiff and Respondent,  v.  M.C.,  Defendant and Appellant. | (Super. Ct. No. EJ4348) |

APPEAL from a judgment of the Superior Court of San Diego County, Marian F. Gaston, Judge.  Affirmed.

Jamie A. Moran, under appointment by the Court of Appeal, for Defendant and Appellant.

Caitlin E. Rae, Chief Deputy County Counsel, and Eliza Molk, Senior Deputy County Counsel, for Plaintiff and Respondent.

M.C. (Mother) appeals from a judgment of the juvenile court terminating her parental rights as to minor child A.D. Mother asserts there is insufficient evidence to support the juvenile court's finding that A.D. was adoptable. We conclude there is substantial evidence to support the finding and affirm the judgment.

FACTUAL AND PROCEDURAL HISTORY

A

A.D. was placed on a hospital hold after testing positive for cocaine at birth. Mother admitted to using narcotics while pregnant. She identified D.D., who was present at the hospital, as A.D.'s father. D.D. admitted knowing about Mother's drug use during the pregnancy. In addition, Mother disclosed incidents of domestic violence in which D.D. dragged her, kicked her, and threw objects at her pregnant belly. D.D. denied the allegations but admitted it sometimes became physical when he and Mother fought.

The San Diego County Health and Human Services Agency (the Agency) filed a juvenile dependency petition on A.D.'s behalf shortly thereafter, in January 2019. The juvenile court found the Agency made a prima facie showing on the petition, and A.D. was placed in a confidential foster home while the Agency evaluated the home of D.D.'s cousin, Terri G.[1]

Mother continued to test positive for cocaine. Mother denied any domestic violence between her and D.D., but the maternal grandmother reported Mother and D.D. often argued and said she had heard D.D. threatening Mother.

---

[1] Terri G. (Terri) was considered a relative at the time, but later became a non-relative extended family member (NREFM) when testing revealed D.D. was not A.D.'s biological father.

In a jurisdiction and disposition report dated February 4, 2019, the Agency indicated A.D. was doing well and recommended she remain placed with her current foster parent while they continued to assess Terri as a relative placement.

B

In an addendum report dated March 4, the Agency reported A.D. had been placed with Terri.

A.D. underwent a development and behavioral screening in late February and scored in the mid-range due to sleeping concerns and an inability to self-soothe. Mother reported a concern about redness on A.D.'s face and Terri confirmed there was some redness but stated it was improving. Terri later indicated A.D.'s face was bumpy, and said she planned to take A.D. to the doctor because she thought it might be a reaction to her formula. Mother also expressed concerns that Terri allowed her 19-year-old niece to care for A.D. while she worked during the day, but Terri stated the niece was qualified to care for A.D.

Mother continued to test positive for cocaine. Her substance abuse counselor recommended an inpatient program, but Mother expressed resistance. Mother denied using cocaine and said she did not know why she continued to test positive. The counselor indicated Mother would likely be discharged from her program due to noncompliance. D.D. also tested positive for cocaine, and both missed several visits with A.D.

On April 11, 2019, the juvenile court made true findings on the petition by clear and convincing evidence, and ordered that A.D. remain placed with Terri.

The court also ordered paternity testing for D.D. and, based on the results of that testing, subsequently found D.D. was not A.D.'s biological

father.  The court struck D.D. from the petition, but A.D. remained placed with Terri as an NREFM.

Mother identified another alleged father, D.S., shortly thereafter.  The Agency made repeated attempts to contact D.S., but he did not respond to letters or telephone calls from the social worker and failed to appear at court.

C

In August 2019, the Agency received a report indicating A.D. was extremely underweight and demonstrated signs of unmitigated hunger while being fed.  The witness said A.D. was approximately 11 pounds at seven months old and "look[ed] like a skeleton."

An Agency social worker made an unannounced visit to Terri's residence that same day.  Terri was not home at the time and the niece would not let the social worker into the home.  Terri returned home but refused to allow the social worker to hold or touch A.D., and the social worker called law enforcement for assistance.

A.D. was removed from the home that evening and taken directly to Rady Children's Hospital (Rady's) for evaluation.  A physician at Rady's indicated A.D. was less than the second percentile on the growth chart and diagnosed A.D. as failure to thrive.  The social worker indicated A.D. had not taken any formula for several hours while in her care and it appeared A.D. did not know how to drink from a bottle.  A.D. was admitted to the hospital for monitoring.

A child abuse specialist reviewed A.D.'s records and indicated A.D. had steadily declined on the growth chart since birth.  Although A.D. was getting sufficient calories to maintain height growth, she was not receiving enough calories to maintain appropriate weight growth.  Terri said she was giving A.D. 16 ounces of formula a day, and the doctor indicated this was not

4

sufficient for an infant A.D.'s age. In addition, A.D. demonstrated a general inability to suck, which suggested a prolonged period without bottle feeding, and significant daily weight gain while in the hospital consistent with "catch up growth."

The Agency filed a second juvenile dependency petition on behalf of A.D. on August 22, 2019, and alleged Terri was no longer an appropriate caregiver. The juvenile court found the Agency made a prima facie showing on the petition and removed A.D. from Terri's care.

### D

A.D. was subsequently placed in a confidential licensed foster home and adjusted well to the placement. The caregiver indicated at the outset that she was unable to provide long-term care for A.D., but said she was committed to caring for her until reunification or a permanent placement became available.

In September 2019, the juvenile court made true findings on the petition by clear and convincing evidence and ordered continued placement of A.D. in the foster home.

In November, A.D. was diagnosed with a food allergy. The caregiver followed up with the allergy department at Rady's and further testing indicated A.G. had a minor allergy to egg. The allergist recommended the caregiver give A.D. one serving of baked egg each day, which the caregiver did without incident.

Meanwhile, Mother continued to test positive for cocaine. She entered a new treatment program but refused to allow the social worker to speak with her counselor. Mother also attended drug court, but the court reported poor compliance. As a result, in November 2019, the Agency recommended

the juvenile court terminate reunification services for Mother and set a Welfare and Institutions Code[2] section 366.26 permanency hearing.

The juvenile court adopted the recommendations and terminated services for Mother.

E

In February 2020, A.D. transitioned into a new foster home with caregivers that expressed a willingness to adopt her.  A.D. had gained weight somewhat consistently with the previous caregivers but continued to be diagnosed with poor weight gain and mild developmental delays.

In a section 366.26 report dated March 16, 2020, the Agency indicated A.D. was "generally adoptable based on her numerous appealing characteristics such as her young age, attractive physical appearance and appropriate physical, mental and emotional development."  In addition, the Agency indicated A.D. was specifically adoptable by her current caregivers, who expressed a desire to provide a permanent home for A.D.  Although A.D. tested positive for cocaine at birth, the Agency noted she was an overall healthy toddler that presented with a happy and friendly demeanor.  The Agency indicated it had no apprehensions about finding a home for A.D. if the need arose.  A court appointed special advocate (CASA) submitted a report around the same time and also indicated A.D. was adjusting well to the new caretakers, and they were interested in adopting A.D.

Mother stopped visiting with A.D. in person in March, in part due to the Covid-19 pandemic.  In May she told the Agency social worker she could not resume in person visits because of transportation issues.  The Agency offered bus passes, but Mother responded she would continue with virtual

---

2    All further statutory references are to the Welfare and Institutions Code.

6

visits. Mother had two virtual visits with A.D. in June, one additional virtual visit with A.D. in July, and two in-person visits in August.

Meanwhile, D.S. contacted the Agency social worker and requested paternity testing. The juvenile court ordered the testing and it confirmed D.S. was A.D.'s biological father. D.S. had two visits with A.D. in August 2020.

That same month, A.D.'s caretakers submitted a caregiver information form and a request to be named as de facto parents for A.D. In an addendum report dated August 31, 2020, the Agency noted A.D. was thriving with her current caretakers and continuing to gain weight. A.D. viewed them as her primary caregivers and referred to them as "Mom and Dad." The Agency noted D.S. had said he wanted to be part of A.D.'s life, but recommended termination of his parental rights to allow for permanency for A.D.

In an addendum report submitted in October, the Agency indicated A.D. had been in her current placement for approximately eight months, which was the longest A.D. had been in any single placement. The Agency reported A.D. had established a secure and predictable routine and continued to refer to her caregivers as "Mom and Dad." The Agency therefore continued to recommend the juvenile court terminate Mother's and D.S.'s parental rights to allow for adoption.

At the section 366.26 hearing on November 2, 2020, Mother asserted A.D. was not generally or specifically adoptable based on her slow weight gain and need for ongoing physical and occupational therapy. Counsel for D.S. indicated D.S. had decided it was in A.D.'s best interest to remain with her current caregivers. After hearing argument, the juvenile court found A.D. was both generally and specifically adoptable. The court terminated

Mother's and D.S.'s parental rights and granted prospective adoptive parent status to A.D.'s caregivers.

Mother appeals.

DISCUSSION

Mother's sole contention on appeal is that there is insufficient evidence to support the juvenile court's finding that A.D. was adoptable.

I

Once the juvenile court terminates reunification services in a dependency proceeding, the focus shifts from preserving the family to promoting the best interests of the child, including the child's interest in a stable, permanent placement. (*In re Stephanie M.* (1994) 7 Cal.4th 295, 317; *In re Fernando M.* (2006) 138 Cal.App.4th 529, 534; *In re Autumn H.* (1994) 27 Cal.App.4th 567, 573.) At that point, the juvenile court has three options; it can terminate parental rights to allow for adoption, appoint a legal guardian, or place the child in long-term foster care. (*In re Fernando M., supra*, at p. 534.) Adoption is the preferred option, so long as the juvenile court finds, "by a clear and convincing standard, that it is likely the child will be adopted." (§ 366.26, subd. (c)(1); *In re Autumn H., supra,* at p. 573.)

In determining whether it is likely that a child will be adopted, the juvenile court considers whether the child's age, physical condition, and emotional state make it likely that a family willing to adopt the child will be identified, or whether a specific family willing to adopt the child has already been identified. (*In re Zeth S.* (2003) 31 Cal.4th 396, 406; *In re B.D.* (2008) 159 Cal.App.4th 1218, 1231; *In re Carl R.* (2005) 128 Cal.App.4th 1051, 1061.) If the court determines the child is generally adoptable, it is not required to examine the suitability of a particular prospective adoptive home; but if the juvenile court determines the child is specifically adoptable based

8

on a finding that a particular family is willing to adopt the child, the court must determine whether there is a legal impediment to the adoption. (*In re Carl R., supra,* at p. 1061.)

We affirm the juvenile court's finding of adoptability on appeal if there is substantial evidence to support a finding, by clear and convincing evidence, that the child is either generally or specifically adoptable. (See *In re Gregory A.* (2005) 126 Cal.App.4th 1554, 1561-1562). The California Supreme Court recently clarified, "when presented with a challenge to the sufficiency of the evidence associated with a finding requiring clear and convincing evidence, the [appellate] court must determine whether the record, viewed as a whole, contains substantial evidence from which a reasonable trier of fact could have made the finding of high probability demanded by this standard of proof." (See *In Re Conservatorship of O.B.* (2020) 9 Cal.5th 989, 1005.)

As the appellant, Mother bears the burden of establishing there is insufficient evidence to support the juvenile court's adoptability finding. (*In re R.C.* (2008) 169 Cal.App.4th 486, 491.)

II

Here, there was substantial evidence to support the juvenile court's finding that A.D. was both generally and specifically adoptable.

At the time of the section 366.26 hearing, A.D. was not quite two years old. She was an active, social, and generally happy child. She napped regularly and enjoyed swinging, reading books, and dancing to music. The Agency indicated she was "generally adoptable based on her numerous appealing characteristics such as her young age, attractive physical appearance and appropriate physical, mental and emotional development." According to the Agency, A.D. met the qualifications for numerous adoptive

9

families and it had no concerns about finding a placement for A.D. if the need arose.

In addition, A.D. had been placed with the prospective adoptive family for over eight months. She was secure and thriving in their care despite her medical and developmental challenges and referred to them as "Mom and Dad." She was healthy and gaining weight, her speech had improved, and she was doing well with gross motor, fine motor, problem solving, personal, and social skills. The prospective adoptive parents had attended numerous medical and therapy appointments with A.D. and, despite being well aware of any associated challenges, they expressed a desire to adopt A.D. They had previously adopted two other children through the Agency, understood the commitment, and indicated they were willing and able to meet A.D.'s daily needs on an ongoing and permanent basis.

Mother asserts the Agency failed to present the juvenile court with the necessary clear and convincing evidence to establish A.D. was adoptable. As Mother points out, section 366.21, subdivision (i), requires the Agency to provide "[a] preliminary assessment of the eligibility and commitment of any identified prospective adoptive parent . . . to include a social history including screening for criminal records and prior referrals for child abuse or neglect, the capability to meet the child's needs, and the understanding of the legal and financial rights and responsibilities of adoption and guardianship." However, Mother specifically does not contend there was any defect in the Agency's assessment that necessitates reversal, and instead contends the Agency did not provide sufficient evidence to support the juvenile court's adoptability findings.

Specifically, Mother asserts the Agency did not provide sufficient evidence the caregivers were sufficiently aware of or willing and able to

10

address A.D.'s medical challenges. We disagree. A.D. had undergone numerous assessments related to her slow weight gain, allergies, and general development. The prospective adoptive parents were well aware of A.D.'s medical and developmental needs and demonstrated a willingness to attend to those needs. A.D. had been gaining weight while in their care and had graduated from some of her services. Moreover, as discussed, the prospective adoptive caregivers wanted to adopt A.D.

Mother contends *In re Valerie W.* (2008) 162 Cal.App.4th 1 (*Valerie W.*) is instructive here, but it is not. In *Valerie W.*, the court found the Agency failed to comply with the assessment requirements of section 366.21, subdivision (i), and those failures undermined the juvenile court's finding of adoptability. (*Id.* at pp. 13-15.) Mother asserts the Agency's assessment in this case was similarly lacking, but she expressly does not allege the Agency failed to meet the requirements of section 366.21, subdivision (i), and also does not allege the Agency failed to include any specific information in its reports.

Specifically, the court in *Valerie W.* concluded the Agency failed to include important information in its reports regarding recent test results and pending testing regarding one of the children being considered for adoption. (*Id.,* at p. 13.) Mother contends A.D. had special needs like the child at issue in *Valerie W.*, but she relies heavily on the Agency's reports to describe those needs, belying her own contention. Indeed, Mother is only able to rely on the Agency reports because they contained extensive detailed information regarding A.D.'s medical and developmental history and needs.

Moreover, there was substantial evidence, in the Agency's reports and the prospective foster parents' own de facto parent status request, indicating the prospective adoptive parents were fully aware of A.D.'s special needs, and

11

both capable and willing to meet those needs on an ongoing and permanent basis.  The mere fact that A.D. had some medical or developmental needs was not an impediment to adoption, particularly where, as here, the prospective adoptive parents were well aware of and attentive to those needs.  (See *In re Helen W.* (2007) 150 Cal.App.4th 71, 79-80.)  Rather, A.D.'s specialized needs, and the caregivers' attentiveness to those needs, weigh in favor of permanency for A.D.

DISPOSITION

The judgment is affirmed.


McCONNELL, P. J.

WE CONCUR:


AARON, J.


DATO, J.