Filed 9/11/20  In re Gabriel K. CA1/2

**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

## IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

## FIRST APPELLATE DISTRICT

## DIVISION TWO

| | |
|---|---|
| In re GABRIEL K., a Person Coming Under the Juvenile Court Law. | |
| ALAMEDA COUNTY SOCIAL SERVICES AGENCY,<br><br>　　　Plaintiff and Respondent,<br>v.<br>J.G.,<br>　　　Defendant and Appellant. | A159108<br><br>(Alameda County<br>Super. Ct. No. JD028001202) |

J.G.(mother) appeals an order terminating her parental rights over her four-year-old son, Gabriel K., contending only that the juvenile court erred in declining to apply the parental benefit exception.  (See Welf. & Inst. Code, § 366.26, subd. (c)(1)(B)(i).[1])  We affirm.

### BACKGROUND

These proceedings were commenced on January 9, 2017, when Gabriel was nine months old, after mother was arrested for engaging in prostitution and police found Gabriel sitting in a car next to a backpack containing

---

[1]  All statutory references are to the Welfare and Institutions Code.

1

marijuana and a loaded gun.[2] The baby was removed from mother's custody, detained and declared a dependent of the court.

Thereafter, mother received reunification services which were terminated on May 7, 2019 (about five months after father's), and the matter was set for a section 366.26 hearing. By that juncture, she had only just begun to have unsupervised visits (in March 2019), and she had never progressed to overnight visits because she'd been inconsistent in being on time and prepared for visits. Once her unsupervised visits began, she was almost always late to pick up and drop off her son, frequently by one to two hours.

After her reunification services were terminated, mother didn't visit her son at all for the next three months, until early August.[3] On June 27, about a month and a half into this period, she was hospitalized for several days after trying to harm herself, and her infant daughter (Gabriel's half-sister) was removed from her custody, detained and placed into foster care.

As a result of the incident, the juvenile court authorized the Alameda County Social Services Agency ("Agency") to supervise mother's weekly visitation, and also warned mother's visitation could be reduced to once per month if she missed two consecutive visits.

After several continuances, the contested section 366.26 hearing began on November 20, 2019. By this time, Gabriel was nearly four years old, and had been living with his maternal grandparents for more than two years,

---

[2] The case was commenced in Santa Clara County and later transferred to Alameda County.

[3] She testified she had tried numerous times to contact her social worker to arrange for visits in this period but was unaware her case had been transferred to someone else, and the Agency was unresponsive.

since September 2017 when he was one and a half years old.[4]  They had been part of his life since birth.  The Agency reported he was thriving there, he was in good health and having all his needs met, and they were reportedly willing and able to adopt him.  He had never been returned to mother's custody.

The contested hearing took place over two days.  The only two witnesses were mother and Alameda County adoptions worker, Melissa Ryan, who had been assigned to the case at the end of May 2019 after mother's reunification services were terminated.

At the conclusion of the hearing, the juvenile court made findings the parental benefit exception did not apply.  First, it ruled that it was "arguable" that mother had not met her burden on the first prong of the exception (relating to visitation and contact with the minor), because it found that her visitation had been "spotty," and explained its reasoning on that point.  With regard to the remaining issues, the court noted Gabriel had been living with his current caregivers far longer than he had lived with mother.  And it made the following findings about Gabriel's bond with mother:  "[H]e loves his mother.  He should.  He's supposed to.  The question is whether or not the relationship with mom is so beneficial to him that it would be detrimental to [not] provide him with what the other beneficial thing is stability, permanence.  And I don't see that the relationship between mom and Gabriel is such that you all have met that burden. [¶] . . . [C]learly Gabriel enjoys seeing his mom, but there's no indication that he is having melt-downs, or angry, or sad, or crying when he leaves."  The juvenile court also reasoned

_____

[4]  Initially, he had been placed with his father for about the first eight months of the case until his father gave the baby up to the maternal grandparents with no plans to resume custody.

that not until the very last visit had mother had the kind of involvement with Gabriel one expects from a parent such as inquiring about his school or his needs. It thus concluded that the benefits of adoption were not outweighed by the nature of mother's parental relationship with Gabriel. It found that the permanence he could have in his grandparents' home "does outweigh whatever the parental relationship is between he and his mom."

The juvenile court entered an order terminating parental rights, and mother then timely appealed.

## DISCUSSION

Once parental reunification has failed, the juvenile court is required to terminate parental rights if the court finds by clear and convincing evidence that it is likely the child will be adopted, "unless either of the following applies: [¶] . . . [¶] (B) The court finds a compelling reason for determining that termination would be detrimental to the child due to one or more of the following circumstances: [¶] (i) The parents have maintained regular visitation and contact with the child and the child would benefit from continuing the relationship." (§ 366.26, subd. (c)(1)(B)(i).)

The standard of review for a juvenile court's ruling under this exception is unsettled and has been taken up for review by our Supreme Court. (See *In re Caden C.* (July 24, 2019, S255839), 444 P.3d 665.) Here, the parties agree that it entails some combination of substantial evidence review and abuse of discretion. (Compare, e.g., *In re Autumn H.* (1994) 27 Cal.App.4th 567, 576 (*Autumn H.*) [substantial evidence]; *In re Jasmine D.* (2000) 78 Cal.App.4th 1339, 1351 [abuse of discretion]; *In re J.C.* (2014) 226 Cal.App.4th 503, 530-531 [substantial evidence review as to whether beneficial parent-child relationship exists and abuse of discretion review as to whether that

4

relationship provides a compelling reason to apply exception]; *In re K.P.* (2012) 203 Cal.App.4th 614, 621-622.)

The "practical differences" between these standards are not significant. (*In re Jasmine D.*, *supra*, 78 Cal.App.4th at p. 1351.) Both standards require broad deference to the trial court. (*Ibid.*) In reviewing the sufficiency of the evidence, we consider the evidence in the light most favorable to the County, giving it the benefit of every reasonable inference and resolving all conflicts in support of the trial court's ruling. (*Autumn H.*, *supra*, 27 Cal.App.4th at p. 576.) Likewise, " ' "[t]he appropriate test for abuse of discretion is whether the trial court exceeded the bounds of reason. When two or more inferences can reasonably be deduced from the facts, the reviewing court has no authority to substitute its decision for that of the trial court." ' " (*In re Jasmine D.*, at p. 1351.) Under either standard, or a hybrid of both, we find no error.

We do not need to decide whether mother met her burden to prove that she maintained regular visitation and contact with Gabriel, as required by the first prong, because she did not meet her burden to prove the existence of a beneficial parental relationship that was compelling enough in these circumstances to outweigh the benefits of achieving permanency for him through adoption.

To demonstrate a beneficial parent-child relationship, it is not enough for a parent to show loving and affectionate contact with their child and an emotional bond. (*In re K.P.*, *supra*, 203 Cal.App.4th at p. 621.) "Interaction between natural parent and child will always confer some incidental benefit to the child." (*Autumn H.*, *supra*, 27 Cal.App.4th at p. 575.) Rather, a parent must show he or she " 'occup[ies] "a parental role" in the child's life.' " (*In re K.P.*, at p. 621.) The exception must be examined on a case-by-case basis,

5

taking into account factors such as "[t]he age of the child, the portion of the child's life spent in the parent's custody, the 'positive' or 'negative' effect of interaction between parent and child, and the child's particular needs . . . ." (*Autumn H.*, at p. 576.)

The relationship must "promote[] the well-being of the child to such a degree as to outweigh the well-being the child would gain in a permanent home with new, adoptive parents." (*Autumn H.*, *supra*, 27 Cal.App.4th at p. 575.) The court must "balance[] the strength and quality of the natural parent/child relationship in a tenuous placement against the security and the sense of belonging a new family would confer. If severing the natural parent/child relationship would deprive the child of *a substantial, positive emotional attachment such that the child would be greatly harmed*, the preference for adoption is overcome and the natural parent's rights are not terminated." (*Ibid.*, italics added.)

The juvenile court did not abuse its discretion in concluding that, while Gabriel obviously loves mother, she failed to prove that his attachment to her rises to that level. On the contrary, ample evidence supports its finding that their bond was not "so beneficial" to him that it would be detrimental if it were severed in favor of providing him a permanent home. Gabriel was nearly four years old and had not lived with mother since he was a baby. The section 366.26 report noted that Gabriel looked to his grandparents for comfort and affection. He could not recognize mother by name or in pictures. Mother's visits had never progressed to overnight visitation. After her reunification services were terminated, she showed up to one visit high on marijuana and missed another visit because she was incarcerated in San

6

Francisco County jail. And throughout the case, mother rarely inquired about Gabriel's life or well-being.[5]

In addition, Gabriel's emotional attachment to mother was not "substantial." Ms. Ryan testified Gabriel was happy to see mother during the visits that she supervised, and even excited to see her when she arrived on the train. But she also testified he was not distressed when the visits ended,[6] he would accept goodbye hugs from her with "flaccid" arms at his side, and she never saw him seek comfort from mother during their interactions. Nor was Gabriel distressed when visits were missed—including on one occasion when mother cancelled a visit after he already had arrived to see her, nor during the three-month lapse when mother did not see him at all. His grandparents reported that he would sometimes cry, ask to go home and ask for "papa" (his grandfather) at the end of his visits with mother. Another time, it was reported that he became upset during a visit when it was time to leave a park, and only the social worker, not mother, could console him and then he separated easily from mother when the visit ended.

In arguing the juvenile court erred in its evaluation of Gabriel's attachment to her, mother points principally to evidence she acted in a loving and adult-appropriate way toward Gabriel during their visits, and that he

---

[5] She began asking Gabriel's grandparents about such matters more than two years into the case, in March 2019, which was only several months before her reunification services were terminated. She didn't ask her social worker about Gabriel's health or well-being until her very last supervised visit with him (on December 3, 2019), which took place while the section 366.26 was already underway.

[6] Mother disputed this, but the juvenile court was entitled to believe Ms. Ryan. (See, e.g., *In re J.C.*, *supra*, 226 Cal.App.4th at p. 531 [upholding findings concerning visitation where evidence was disputed and juvenile court accepted social worker's account and found mother's account not credible].)

was happy to see her. At most, though, her evidence suggests mother occupied the role of a " 'friendly visitor or friendly nonparent relative,' " which isn't enough to satisfy the exception. (*In re Helen W.* (2007) 150 Cal.App.4th 71, 81 [affirming order terminating parent rights despite evidence mother fed and changed children during visits, was called "Mom," where children were young and spent most of their lives out of mother's custody].) The most pertinent evidence of some attachment she cites is her testimony that sometimes he told her he wanted to go home on the train with her at the end of her visits with him. But that evidence does not compel reversal. The juvenile court was not required to believe mother's testimony about this. Moreover, even if her testimony were credited, the court was entitled to infer, in light of the entire record, that Gabriel's comments simply reflected a toddler's curiosity about a home he had never visited since infancy, not a substantial emotional attachment expressed as a desire to live with her. They do not demonstrate a compelling reason to forgo the benefits of adoption. Some of the authorities mother herself cites involve records similar to this one, and demonstrate the juvenile court did not err.[7] "Many toddlers

---

[7] See, e.g., *In re Bailey J.* (2010) 189 Cal.App.4th 1308, 1315-1316 (affirming, despite evidence of frequent and loving contact during visitations, including that child was excited to see parent and called her "mommy," parent fed child and believed she and child had a strong parental bond; child spent no time in mother's custody, all contact took place through supervised weekly visitations, no evidence child had difficulty separating from mother at visitations or looked forward to them, and no evidence child benefitted from the visits); *In re Aaliyah R.* (2006) 136 Cal.App.4th 437, 450 (affirming, despite psychologist's finding of " 'affectionate closeness' " between parent and three-year-old child, where child had spent more time in foster care than living with parent, had bonded with foster parent and no evidence that severing mother's relationship would harm the child); see also *In re Zachary G.* (2000) 77 Cal.App.4th 799, 811 (affirming, despite evidence of mother's positive relationship with child and expert testimony that child had a strong

8

are cuddly, effusively loving, and affectionate.  [Gabriel] did not display the depth of emotional attachment to Mother" that is required to overturn the juvenile court's order.  (*In re J.C.*, *supra*, 226 Cal.App.4th at p. 533.)

## DISPOSITION

The order terminating parental rights is affirmed.

---

bond and would suffer psychological distress if adopted, where there was contrary evidence the relationship was not a parental one and child relied on other adults to meet his needs).

_____

STEWART, J.

We concur.

_____

RICHMAN, Acting P.J.

_____

MILLER, J.

*In re Gabriel K.* (A159108)