Filed 9/8/22 In re R.S. CA4/3

## NOT TO BE PUBLISHED IN OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b). This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

## IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

### FOURTH APPELLATE DISTRICT

### DIVISION THREE

| | |
|---|---|
| In re R.S., a Person Coming Under the Juvenile Court Law. | |
| ORANGE COUNTY SOCIAL SERVICES AGENCY,<br><br>    Plaintiff and Respondent,<br><br>        v.<br><br>B.S.,<br><br>    Defendant and Appellant. | G061350<br><br>(Super. Ct. No. 19DP1119)<br><br>O P I N I O N |

Appeal from orders of the Superior Court of Orange County, Vibhav Mittal, Judge. Affirmed.

Joseph T. Tavano, under appointment by the Court of Appeal, for Defendant and Appellant.

Leon J. Page, County Counsel, Karen L. Christensen and Deborah B. Morse, Deputy County Counsel, for Plaintiff and Respondent.

No appearance for the Minor.

*          *          *

This is an appeal by B.S. (the mother) of dependent child R.S. (the child) after the juvenile court terminated parental rights. She argues the court erred by failing to invoke Welfare and Institutions Code section 366.26, subdivision (c)(1)(B)(i),[1] the parental-benefit exception (benefit exception) to termination of parental rights. The court found that although she met the requirement of regular visitation, she had not met her burden as to the remainder of the statute's requirements. The mother argues the court considered inappropriate factors in conducting its analysis and lacked substantial evidence to find the benefit exception did not apply. We find no error and therefore affirm the court's orders.

I

FACTS

We focus on the facts relevant to the limited issue the mother raises on appeal. In September 2019, police conducted a search and found drugs, including a "large amount of heroin," and drug paraphernalia in the mother's possession. The child, who was just past his first birthday, was taken into protective custody. The mother was charged with narcotics-related crimes. The alleged father, T.S., was incarcerated at the time.

Investigation revealed that the mother had a lengthy history of drug-related charges and convictions. She had previously been ordered by the court to complete a substance abuse treatment program, but she had not remained sober.

The Orange County Social Services Agency (SSA) filed a petition pursuant to section 300, subdivisions (b)(1) (substantial risk of serious harm), and (g) (lacking provision for support). At the detention hearing, the mother appeared in custody. The

---

[1] Subsequent statutory references are to the Welfare and Institutions Code.

court found a prima facie case had been established and ordered the child detained. The court ordered visitation up to 10 hours a week when the mother was released from custody.

The mother reported to the social worker that her history with drug abuse began when she was 15 years old, although she denied using drugs while she was pregnant. She missed several visits with the child after her release from custody and then attended six. The caregiver reported that the mother appeared to make an effort and brought wipes, diapers, and items for the child. The child appeared happy during visits.

The social worker was contacted by Shawna R., the caregiver of the child's half-sibling on his father's side. She asked for the child to be placed with her. At the jurisdiction hearing, the court found the allegations in the petition true and set the matter for a disposition hearing.

In an addendum report, SSA reported that the child had been placed with Shawna. The mother had been on time for visits and the child appeared to be very engaged with her. A few weeks later, Shawna reported the mother was visiting three times a week and that the child "gets excited" when he sees the mother and was "easy-going on the visits." She also noted that when the child wanted to be held by Shawna, the mother would cut the visit short.

The mother reported she was convicted of the charges relating to her arrest, placed on probation for four years, and ordered to complete a child abuse treatment program.

The disposition hearing took place in February 2020, approximately five months after detention. The court found the child was at substantial risk if returned to the mother's home and ordered custody removed pursuant to section 361, subdivision (c)(1). Services for the mother were ordered, and her plan included general counseling and an alcohol treatment program that required testing.

The next status review report was submitted in July 2020. The mother continued to visit (virtually as of April 2020), although the virtual visits were less consistent or cut short. Shawna and the social worker reported that visits that did happen went well and that the mother was appropriate and attentive. Shawna was comfortable doing in-person visits, but the mother had numerous reasons why she could not do in-person visits, including health issues and repeated alleged COVID-19 exposures.

The mother's progress on her case plan was minimal. She missed counseling appointments, substance abuse sessions, and sessions of her parenting education class. Her counselor thought the mother might be telling him what she thought he wanted to hear. She missed numerous tests and had two positive tests in May, for amphetamines and methamphetamine. The mother denied using illegal substances. She continued to decline to participate in an 18-month residential program, where she could have the child in her care if she reunified. The mother also reported to SSA that she hit her ex-boyfriend's vehicle and had been charged with assault with a deadly weapon in Los Angeles County.

The child, meanwhile, was doing well with Shawna. He was "a good eater and a good sleeper," and he presented as a "happy, healthy, playful, and curious child." The court ordered services continued and set a 12-month review hearing.

During the next period of supervision, the mother completed a substance abuse treatment program and enrolled in aftercare. She was in compliance with her probation terms. SSA continued to have concerns regarding the mother's ability to maintain sobriety. The mother reported that she resumed her relationship with her ex-boyfriend for a time, while he continued to use methamphetamine. In mid-October, she had several positive tests for alcohol. She denied drinking before admitting she had done so.

Visits continued, in person once a week and virtually twice a week. Shawna reported problems with the virtual visits, including the mother's location. She was at a casino for one visit and was driving during others.

The child continued to do well in his placement, and all of his needs were being met. He had recently started calling Shawna "mom."

SSA recommended more time to reunify and stated that the mother could be assessed for unsupervised visits if the mother had six consecutive weeks of negative drug tests. The court agreed and set the matter for an 18-month review hearing.

During the next period of supervision, the mother continued to participate in services, although concerns remained, particularly about the ex-boyfriend. She also had one positive alcohol test and one dilute test.

The mother tested positive for COVID-19 in December 2020, and thereafter, there were issues with in-person visitation due to Shawna's concerns. In March 2021, the court authorized SSA to return the child to mother on a trial basis under the supervision of Intensive Family Support Services. The visit began on March 11. On March 24, there was a call to the child abuse registry which stated that the mother had been involved in a physical altercation with several adults while the child was present, and further, there were "always" fights at that address, a known location for drug users. The mother was overheard stating: "'I just got my kid back from CPS, I don't need to be around this stuff.'" Shortly thereafter, the mother tested positive for alcohol, and the social worker found the mother's excuses implausible.

There were issues with poor supervision and the maintenance of the home reported less than a month later. On April 7, the child left the home while the mother was in the shower and was returned to the home by a passerby.

During an unannounced visit on April 15, SSA found the house dirty, with sticky floors, debris, old food, and dangerous items laying within the child's reach,

including scissors and a knife. There were other similar incidents. The mother persistently blamed the condition of the house on her roommate.

On a visit in mid-April, the child waved to the social worker from an upstairs window as she approached, and as the social worker waited for the mother to open the door, the child opened the window and began climbing outside. Half of his body was outside before the mother grabbed him. The house was again dirty and disorganized and the sink was full of dishes. The social worker advised the mother to buy and install window alarms, but the mother had not done so by the next week.

Pursuant to a recommendation by SSA, the court ordered the trial visit extended by 60 days, but under strict conditions. Four days later, the trial visit failed when choking and safety hazards were observed during two visits on consecutive days. The child was returned to his previous foster home. In sum, the child was in the mother's care from March 11 to May 14. It also came to light that the mother was dating a man on state parole for felony drug crimes. He was apparently friends with the child's incarcerated father.

Following his return to Shawna's care, the child made the transition well, and virtual visits with the mother resumed. The mother failed to attend several visits. The mother also corrected the child when he referred to the mother by her name or Shawna as "mom." At in-person visits, she would sometimes fail to bring supplies, check if he needed a diaper change, or provide him with refreshments. She would also fail to control the child's behavior at times.

The mother moved to a new home, but visits by SSA revealed safety hazards similar to those at her prior residence. While the mother stated she lived alone, the social worker observed men's toiletries and clothing. The mother claimed these belonged to her father. The mother stated her father did not live in the home, but that he came over to shower sometimes. The social worker was concerned the mother was not being forthcoming and believed it was possible a male was residing in the home.

6

Prior to the continued 18-month review hearing, SSA recommended terminating services. "Based on all of the information provided, the undersigned believes that the mother has not demonstrated that she has been able to mitigate the issues which brought her family to the attention of the Court, and she has not mitigated the issues which led to her failed trial visit with the child. The undersigned believes that there are still ongoing concerns which prevent the child from being safely returned to the mother's care. The undersigned believes that the child is in need of permanency at this time. The child is placed with a caregiver who is able and willing to provide permanency, if needed. The child is placed with his older paternal half-brother (nondependent). The child is placed in a home where he is doing well, and where all of his needs are being met."

On September 9, the mother's services were conditionally terminated per a negotiated agreement, which provided for certain continued services and six hours a week of visitation. SSA attempted to liberalize visitation, but one week later the mother tested positive for alcohol, and visits reverted to supervised. The mother denied alcohol use. Thereafter, the mother cancelled three visits, and the child began to express reluctance to visit with her. Shawna believed this was due to the mother's cancellations at the last minute. The mother often terminated visits early, on one occasion telling the child she was leaving because he was not listening to her. Shawna reported negative behaviors and acting out by the child after visits, and he once asked why his mother "'always hurt'" his feelings.

The child's needs were being met in his foster home, and Shawna expressed the desire to adopt him. SSA recommended rights be terminated and the child freed for adoption.

The court heard and subsequently denied a section 388 petition filed by the mother requesting further services. The mother testified that the child would tell her he missed her at visits, and would come to her for emotional support. At the end of visits,

7

she testified he would be sad and say that he did not want to leave and would ask to go with her. The mother testified she had a special bond with the child.

The mother's longest period of sobriety to date was eight months, and she claimed she had been sober since September 27, 2021. Her drug of choice was methamphetamine, and she did not believe she had an issue with alcohol. She stated the reason for the failure of the trial visit was the cleanliness of the house. The mother testified that if the child was returned to her, "it would be really easy for me to stay on the right path."

The social worker testified that the child had a strong bond with Shawna, and she did not believe the mother had demonstrated over time that she could remain sober. She had a cycle of relapses after short periods of sobriety. The mother was also living with a new boyfriend who was also in recovery. Shawna testified that the child had fun with the mother, but there was no dependence on her.

The mother's counsel argued that the benefit exception should apply, characterizing her as someone the child loved. County counsel contended that serious issues with the mother's sobriety and the child's safety in her care still existed, as supported by the mother's own testimony. The child's counsel argued that returning the child to the mother would not be in his best interest. Counsel stated that the mother was a playmate, but she was not the one who met his needs.

At the close of the hearing, on April 28, 2022, the court indicated it was prepared to adopt SSA's recommendation and terminate parental rights. As to the benefit exception issues, the court noted the mother had a history of regular and consistent contact with the child. As to the remaining factors, the child, the court stated, was now three and a half years old, and except for the two-month failed trial period, had been out of his mother's custody since he was one year old.

Overall, the court found there was not sufficient evidence to show that the child would benefit from maintaining the relationship with the mother. There was

8

evidence of difficult visits that were not beneficial to the child. "The evidence submitted, taken together, doesn't show that the relationship would benefit [the child] to the sufficient degree required for the second element, and it's clear from the evidence submitted that [the child] looks to the caregiver as his mother." On balance, the court found that the harm from losing the relationship with the mother was outweighed by the security of a new adoptive home. The evidence showed that the child viewed the mother as "unreliable, at best, and causing him to act out." Applying the standards of *In re Caden C.* (2021) 11 Cal.5th 614 (*Caden C.*), the court determined the mother had not met the requirements to establish the benefit exception. Parental rights were terminated, and the mother now appeals.

## II

## DISCUSSION

The mother's sole argument on appeal is that the juvenile court erred by refusing to apply the benefit exception because it used inappropriate factors. We are fortunate to have recent California Supreme Court guidance on the benefit exception from *Caden C.*, *supra*, 11 Cal.5th 614.[2]

"If the court cannot safely return a dependent child to a parent's custody within statutory time limits, the court must set a hearing under section 366.26." (*Caden C.*, *supra*, 11 Cal.5th at p. 630.) The purpose of the section 366.26 hearing is to select a permanent plan for the child. (*Id.* at pp. 630-631.) Section 366.26 lists permanent plans in order of preference, and adoption is the preferred permanent plan. (§ 366.26, subd. (b)(1); *In re Edward R.* (1993) 12 Cal.App.4th 116, 121-122.) The court must first find

---

[2] Review was granted in *Caden C.* for two reasons – to establish a clear standard of review, and to clarify that the issue of progress on the reasons that led to dependency was not a factor in the beneficial relationship determination. (*Caden C.*, *supra*, 11 Cal.5th at p. 629.) It did not, as the mother seems to think, upend all prior law relating to the applicability of the benefit exception.

9

by clear and convincing evidence that the child is likely to be adopted. (§ 366.26, subd. (c)(1).)  If the court does so, and services have already been terminated, the court then terminates parental rights to permit adoption. (*Caden C.*, at pp. 630-631.)

The exception to this rule is if the parent shows that one of four statutory provisions applies. (§ 366.26, subd. (c)(1)(B)(i)–(vi), (4)(A).)  "[I]f the parent shows that termination would be detrimental to the child for at least one specifically enumerated reason, the court should decline to terminate parental rights and select another permanent plan." (*Caden C.*, *supra*, 11 Cal.5th at pp. 630-631.)  The parent bears the burden of establishing the exception applies. (*In re Beatrice M.* (1994) 29 Cal.App.4th 1411, 1418-1419.)

One of these is the benefit exception.  "From the statute, we readily discern three elements the parent must prove to establish the exception:  (1) regular *visitation and contact*, and (2) a *relationship*, the continuation of which would *benefit* the child such that (3) the termination of parental rights would be *detrimental* to the child." (*Caden C.*, *supra*, 11 Cal.5th at pp. 631-632.)  The mother makes much of the court purportedly using improper factors, but at the end of the day, the question before us is whether, under the correct standards, the court's ruling can be upheld under the relevant standard of review.

The first two elements of the court's analysis are reviewed for substantial evidence. (*Caden C.*, *supra*, 11 Cal.5th at pp. 639-640.)  "In reviewing factual determinations for substantial evidence, a reviewing court should 'not reweigh the evidence, evaluate the credibility of witnesses, or resolve evidentiary conflicts.'" (*Id.* at p. 640.)  "The determinations should 'be upheld if . . . supported by substantial evidence, even though substantial evidence to the contrary also exists and the trial court might have reached a different result had it believed other evidence.'"  (*Ibid.*)

The final step, determining whether termination of parental rights would be detrimental to the child, is reviewed for abuse of discretion. (*Caden C.*, *supra*, 11 Cal.5th

10

at p. 641.) "Review for abuse of discretion is subtly different [than substantial evidence review], focused not primarily on the evidence but the application of a legal standard. A court abuses its discretion only when ""'the trial court has exceeded the limits of legal discretion by making an arbitrary, capricious, or patently absurd determination.'""" (*Ibid*.) "[T]he practical difference between the standards is not likely to be very pronounced." (*Ibid.*) "At its core, the hybrid standard . . . simply embodies the principle that '[t]he statutory scheme does not authorize a reviewing court to substitute its own judgment as to what is in the child's best interests for the trial court's determination in that regard, reached pursuant to the statutory scheme's comprehensive and controlling provisions.'" (*Ibid.*)

As relevant here, the first prong of the benefit exception requires regular visitation and contact. (*Caden C.*, *supra*, 11 Cal.5th at pp. 631-632; *In re Beatrice M.*, *supra*, 29 Cal.App.4th at pp. 1416-1417.) The court concluded the mother had satisfied the first prong.

If visitation and contact is sufficient, the court must next determine whether a beneficial relationship exists. The focus in doing so is on the child. (*Caden C.*, *supra*, 11 Cal.5th at pp. 632-633.) The mother argues the court below ruled as it did because the child's primary bond was with Shawna rather than with her, but we disagree. She focuses on arguments and comments made at the section 366.26 hearing rather than on the evidence, and when she does discuss the evidence, she picks and chooses items that support her argument, rather than looking at the evidence as a whole.

In *Caden C.,* the court held that "the parent must show that the child has a substantial, positive, emotional attachment to the parent — the kind of attachment implying that the child would benefit from continuing the relationship." (*Caden C.*, *supra*, 11 Cal.5th at pp. 636-637.) The court also referred to *In re Autumn H*. (1994) 27 Cal.App.4th 567, is "the seminal opinion interpreting the exception." (*Caden C.*, at pp. 631-632.) In determining the existence of a beneficial relationship, we look to "[t]he age

11

of the child, the portion of the child's life spent in the parent's custody, the 'positive' or 'negative' effect of interaction between parent and child, and the child's particular needs . . . ." (*In re Autumn H.*, at pp. 575-576.)

Here, the evidence demonstrated that the child had been out of the mother's care for the majority of his life. By the time of the section 366.26 hearing, he had been in the dependency system for two and a half years. As to the positive and negative effects of the parent-child interactions, at best, they could be called mixed. The child clearly enjoyed some visits, and at times the mother was appropriate and attentive. There was also evidence that the child would act out at visits, and the mother would not respond appropriately when he did, leaving the situation to the caregiver to handle. Visits were outings such as eating pizza and watching television, or going to a park. There was also evidence that the child would act out after visits, and he had started to show reluctance to participate.

Even when visits went well, however, there was no evidence, beyond the mother's own testimony, that the interaction between her and the child was anything more than fun or friendly. "[P]leasant and cordial . . . visits are, by themselves, insufficient to mandate a permanent plan other than adoption." (*In re Brian R.* (1991) 2 Cal.App.4th 904, 924.)

The mother attempts to use incidents where her behavior upset the child as *evidence* of their emotional bond, but this is truly disturbing and not reflective of the law. "A parent's struggles may mean that interaction between parent and child at least sometimes has a '"negative" effect' on the child." (*Caden C.*, *supra*, 11 Cal.5th at pp. 637-638.) Those "struggles speak to the benefit (or lack thereof) of continuing the relationship and are relevant to that extent." (*Ibid.*) Here, the mother's cancellation of visits and inappropriate conduct at some visits do not speak to the bond between her and the child – they speak to the detriment and lack of benefit of the relationship.

12

Overall, we find there was more than substantial evidence supporting the court's ruling that the mother had not met her burden to demonstrate a beneficial relationship. While the child cares for the mother, this alone was not sufficient. The mother did not demonstrate the type of "substantial, positive, emotional attachment to the parent" that the law requires. (*Caden C.*, *supra*, 11 Cal.5th at pp. 636-637.)

In the third prong of the analysis, which focuses on "whether 'termination would be detrimental to the child due to' the relationship — the court must decide whether it would be harmful to the child to sever the relationship and choose adoption." (*Caden C.*, *supra*, 11 Cal.5th at p. 633.) In doing so, "the trial court must decide whether the harm from severing the child's relationship with the parent outweighs the benefit to the child of placement in a new adoptive home." (*Id.* at pp. 631-632.) Here, we find no abuse of discretion in the court's determination that the stability of an adoptive home would outweigh any benefit of continuing the child's relationship with the mother. There was overwhelming, uncontroverted evidence that the child was well cared for by an experienced caregiver who wanted to adopt him. Nothing in the record indicates the child had needs that could only be met by the mother, or that their relationship outweighed the security and permanency of an adoptive home. (*In re Helen W.* (2007) 150 Cal.App.4th 71, 81.) The mother did not meet her burden to establish that the benefit exception should be applied in this case.

13

## III

## DISPOSITION

The juvenile court's orders are affirmed.


MOORE, ACTING P. J.

WE CONCUR:


GOETHALS, J.


MOTOIKE, J.