Filed 10/28/25  In re K.E. CA4/1

# NOT TO BE PUBLISHED IN OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

## COURT OF APPEAL, FOURTH APPELLATE DISTRICT

## DIVISION ONE

## STATE OF CALIFORNIA

| | |
|---|---|
| In re K.E., a Person Coming Under the Juvenile Court Law. | |
| SAN DIEGO COUNTY HEALTH AND HUMAN SERVICES AGENCY, | D085780 |
| Plaintiff and Respondent, | (Super. Ct. No. J521237) |
| v. | |
| J.D. et al., | |
| Defendants and Appellants. | |

APPEAL from an order of the Superior Court of San Diego County, Daniela A. Reali-Ferrari, Judge.  Affirmed.

Nita Mehta, under appointment by the Court of Appeal, for Defendant and Appellant J.D., Mother.

Megan Turkat-Schirn, under appointment by the Court of Appeal, for Defendant and Appellant C.E., Father.

David Smith, Acting County Counsel, Lisa M. Maldonado, Chief Deputy County Counsel, and Evangelina Woo, Deputy County Counsel, for Plaintiff and Respondent.

J.D. (Mother) and C.E. (Father) appeal from the juvenile court's order terminating their parental rights to their two-year-old son, K.E. (Welf. & Inst. Code,[1] § 366.26.) They contend the juvenile court erred in finding the parental-benefit exception to adoption did not apply. (*Id.*, subd. (c)(1)(B)(i).) We conclude they have not affirmatively demonstrated error and affirm.

FACTUAL AND PROCEDURAL BACKGROUND

I.

*The Agency's Petition*

In May 2023, the San Diego County Health and Human Services Agency (Agency) received a child welfare referral for then two-month-old K.E. following the arrest of his parents on charges of child endangerment. Their home was dirty, cluttered, smelled like animal feces, and had methamphetamine paraphernalia and drugs accessible to K.E. There was no place for K.E. to sleep.

Mother disclosed she smoked marijuana that morning, used methamphetamine "on and off" and was not taking medications prescribed for her bipolar disorder diagnosis. Maternal grandmother confirmed Mother had previously used marijuana, started using methamphetamine several years earlier, and was diagnosed with bipolar disorder, anxiety, and depression. She said Father also used methamphetamine.

The Agency filed a petition pursuant to section 300, subdivisions (b) and (g) alleging K.E. was at substantial risk of harm due to the drugs and paraphernalia found in the home, as well as the parents' histories of drug use. It further alleged the parents were incarcerated and unable to arrange care for K.E. The court made a prima facie finding on the petition, detained

---

[1]    Undesignated statutory references are to the Welfare and Institutions Code.

K.E. out of his parents' care, and ordered voluntary services and liberal supervised visitation for both parents.

## II.

### *Jurisdiction and Disposition*

The parents had supervised visits with K.E., visited consistently twice per week, and were attentive to K.E. during the visits. However, at the end of August 2023, the caregiver informed the Agency she would not supervise the parents' visits because they were routinely late, and she once heard Mother screaming at Father. The social worker believed the parents' relationship was volatile as Mother disclosed Father caused bruises on her arms and legs. The parents tested positive for methamphetamine in June 2023 and failed to attend other scheduled drug tests. Neither parent contacted the substance abuse specialist nor enrolled in treatment.

At the contested jurisdiction and disposition hearing in September 2023, the court found the petition true, removed K.E. from his parents, placed him in a licensed foster home, and ordered the parents to participate in reunification services.

A few months later, the Agency filed an ex parte request asking the court to grant educational and developmental rights to K.E.'s caregivers. Although K.E. initially participated in developmental services, the parents refused to authorize sessions to take place without them. They did not attend subsequent sessions, which caused K.E.'s developmental services to be on hold. In January 2024, the court ordered education rights be shared between the parents and the caregivers.

III.

*Reunification*

The parents had not participated in any of their case plan services and were not drug testing consistently at the six-month review hearing in March 2024. They had to visit K.E. separately for a brief period due to domestic violence concerns. At visits, they played with him, hugged him, kissed him, and carried him around. The social worker reported K.E. seemed comfortable with his parents and appeared to recognize them. The parents were consistently 20 minutes to an hour late to their scheduled visits and ended visits approximately 20 minutes early. There were concerns they were under the influence at visits as their eyes were red and glossy, and they fell asleep and avoided eye contact. They also bickered at visits. The social worker recommended the visits remain supervised because the parents were not participating in drug treatment or drug testing.

At the 12-month review hearing, the social worker reported the parents arrived on time for visits, changed K.E.'s diaper, put away items he could put in his mouth, and followed him around to ensure he did not get hurt. They played with him and showed affection. The social worker wrote that the parents brought unhealthy food that gave K.E. diarrhea, but overall, there were no concerns regarding their visits. The social worker did not assess the parents for unsupervised visits because they were not in treatment or testing. The court terminated reunification services and scheduled a section 366.26 hearing to choose a permanent plan for K.E. It found the parents failed to make progress in addressing their substance use.

4

## IV.

### *The Agency's Section 366.26 Report*

The social worker recommended adoption as K.E.'s permanent plan. K.E. had been placed with his caregivers since October 2023, and they were committed to adopting him. He was described as "sweet, loving, sensitive, caring, and happy." His developmental screening noted concerns with communication, personal, social, and interactions with others. He received infant education in the caregivers' home weekly.

The parents maintained consistent visitation twice weekly. The parents occasionally argued in front of K.E., although most visits were appropriate. They generally arrived prepared with snacks, toys, or gifts for K.E. K.E. usually went willingly with the social worker who transported him to the visits. Once he cried as the social worker tried to buckle him into his car seat and looked to the caregivers for comfort. He calmed once the caregivers told him he was going to play with his parents. At another visit, he cried and screamed "Mommy" as the caregivers walked back into the home but calmed down on the drive to the visit and appeared happy, clapping to music.

The social worker assessed K.E. was adoptable and no exceptions applied. Although the parents maintained regular contact and most of the visits were appropriate, and K.E. was happy to see them, he did not show distress at the end of visits. He was able to continue his daily routine outside of scheduled visits and was not impacted on days visits did not occur. He did not ask for his parents in between visits. Although he referred to his parents as "mommy and daddy," he also called his caregivers the same. He continued to progress in all areas of development outside his parents' care.

V.

*The Section 366.26 Hearing*

The contested hearing took place in March 2025. The Agency admitted the section 366.26 report and three addenda into evidence.

Father testified he visited K.E. twice per week. They played, sang, and fed him snacks. He described K.E. as "always happy" and that he ran to the parents, hugged them when they arrived and was affectionate during visits. Once it took K.E. 45 minutes to calm down at the end of a visit because he would not stop crying and kept calling for Mother.

Mother testified K.E. called them "mommy and daddy" and ran to them and hugged them. They danced, listened to music, and gave him new foods to try. At the end of visits, K.E. usually looked sad and said, "okay, mommy and daddy" and gave them a kiss and left. She claimed she just learned about the doctor's visits and attended two appointments. She testified they took K.E. to get a haircut, had a birthday party for him, brought him items to mark various holidays and believed he was generally excited to see them.

The Agency argued K.E. was adoptable. While the parents visited consistently, K.E. spent most of his life out of their care, as he was removed when he was two months old. K.E. showed affection but was usually not upset at the end of visits. Regarding the visit where K.E. cried, the Agency argued it was unclear whether K.E. was crying because play time was nearly over, or if he was upset about leaving his parents. K.E. did not ask for the parents nor have any adverse reaction on the days they did not have visits. The parents did not call between visits to inquire about K.E.'s well-being.

Minor's counsel agreed with the Agency that adoption was the preferred permanent plan. Minor's counsel argued the relationship between

6

K.E. and the parents was not parental in nature, as they failed to participate in his medical and developmental appointments. K.E.'s developmental services were significantly delayed because the parents refused to consent to his participation. They did not attend the in-person or virtual sessions when invited. K.E. called both the parents and the caregivers "mommy and daddy." There was little to no evidence the positive contact between K.E. and his parents would outweigh the sense of security and belonging available from an adoptive home.

At the conclusion of the hearing, the juvenile court found K.E. adoptable by clear and convincing evidence. He had lived with his caregivers since he was approximately six months old and they wished to adopt him.

The court evaluated the parent-child bond exception and found it did not apply. Although the parents met the first prong of the analysis as they regularly visited K.E., they did not meet the second prong of having a substantial positive relationship with K.E. The court acknowledged K.E. seemed to enjoy visiting his parents, and the visits appeared affectionate and appropriate, but that was not enough as interaction between a natural parent and child "will always confer some incidental benefit to the child." He only lived with them a "short period of time as an infant" and spent most of his life "out of their care." The court also found the parents failed to meet their burden on the final prong to prove K.E. would suffer detriment that would outweigh the benefits of a new adoptive home. It noted K.E. "cried when leaving his caregivers," appeared "happy to be back in their care" and was "thriving" and had "healthy attachments."

The court terminated parental rights and ordered a permanent plan of adoption.

## DISCUSSION

### I.

#### *General Legal Principles*

"The sole purpose of the section 366.26 hearing is to select and implement a permanent plan for the child after reunification efforts have failed." (*In re J.D.* (2021) 70 Cal.App.5th 833, 851–852.) At this hearing, the court has three options: (1) terminate parental rights and order adoption as the permanent plan; (2) appoint a legal guardian for the child; or (3) order the child placed in long-term foster care. (*In re Fernando M.* (2006) 138 Cal.App.4th 529, 534.) "Adoption is the preferred plan and, absent an enumerated exception, the juvenile court is required to select adoption as the permanent plan. [Citation.] The burden falls to the parent to show that the termination of parental rights would be detrimental to the child under one of the exceptions." (*Ibid.*; § 366.26, subds. (c)(1)(A), (c)(1)(B)(i)–(vi).)

One of the exceptions to the preference for adoption is the parental-benefit exception. (§ 366.26, subd. (c)(1)(B)(i).) For this exception to apply, the parent must show by a preponderance of the evidence: (1) regular visitation and contact with the child; (2) the child has a substantial, positive, emotional attachment to the parent; and (3) terminating that attachment would be detrimental to the child even when balanced against the countervailing benefit of a new, adoptive home. (*In re Caden C.* (2021) 11 Cal.5th 614, 636 (*Caden C.*).)

We review the juvenile court's findings as to whether the parent has maintained regular visitation and contact with the child, as well as the existence of a beneficial parent-child relationship, for substantial evidence. (*Caden C., supra*, 11 Cal.5th at pp. 639–640.) As a reviewing court, we do not

8

reweigh the evidence, evaluate the credibility of witnesses, or resolve evidentiary conflicts. (*Id.* at p. 640.) We will uphold the juvenile court's determinations even where substantial evidence to the contrary also exists. (*Ibid.*) "[T]he ultimate decision—whether termination of parental rights would be detrimental to the child due to the child's relationship with his [or her] parent—is discretionary and properly reviewed for abuse of discretion." (*Ibid.*) A court abuses its discretion when it makes an arbitrary, capricious, or patently absurd determination.[2] (*Id.* at p. 641.)

## II.

### *The Juvenile Court Did Not Abuse Its Discretion in Terminating Parental Rights*

A.      *Regular Visitation*

The analysis of whether a parent has maintained regular visitation and contact is "straightforward" and requires that the parent " 'visit consistently,' taking into account 'the extent permitted by court orders.' " (*Caden C., supra,* 11 Cal.5th at p. 632.) The Agency concedes substantial evidence supported the juvenile court's finding that the parents met the first element of the *Caden C.* analysis, and our review of the record shows that they maintained consistent visitation and contact with K.E. (§ 366.26, subd. (c)(1)(B)(i); see also *In re Helen W.* (2007) 150 Cal.App.4th 71, 80.)

---

[2]      The *Caden C.* court explained " 'there likely will be no practical difference in application of these two standards,' " but "[a]t its core, the hybrid standard [it] now endorse[s] simply embodies the principle that '[t]he statutory scheme does not authorize a reviewing court to substitute its own judgment as to what is in the child's best interests for the trial court's determination in that regard, reached pursuant to the statutory scheme's comprehensive and controlling provisions.' " (*Caden C., supra,* 11 Cal.5th at p. 641.)

B.    *Attachment to Parents*

The second element, whether the child has "a substantial, positive, emotional attachment to the parent," focuses on the child and is determined by taking into consideration factors such as " 'the age of the child, the portion of the child's life spent in the parent's custody, the 'positive' or 'negative' effect of interaction between parent and child, and the child's particular needs." (*Caden C., supra*, 11 Cal.5th at p. 632, citing *In re Autumn H.* (1994) 27 Cal.App.4th 567, 576.)  While "[a] parent's continued struggles with the issues leading to dependency are not a categorical bar to applying the exception," they may have a negative effect on the child such that they are relevant to determining the benefit of continuing the relationship.  (*Caden C.,* at pp. 637–638.)  Further, "[a] positive attachment between parent and child . . . is nurturing and provides the child with a sense of security and stability," and "an emotional attachment is one where the child views the parent as more than a mere friend or a playmate."  (*In re B.D.* (2021) 66 Cal.App.5th 1218, 1230.)

Mother argues "[a]ll of the interactions between Mother and [K.E.] were safe, loving, and parental in nature" and that K.E. "was happy to see Mother during visits, showed her affection, and went to her willingly."[3] Although the record reveals that K.E. had a positive relationship with his parents, substantial evidence supports a finding that the relationship did not rise to the level of implicating the parent-child bond exception to adoption.

In contravention of Mother's assertions, the Agency's reports reflected that K.E. generally separated easily and did not suffer adverse effects upon

---

[3]    Father joined in Mother's arguments and does not advance any additional arguments on his own behalf.

returning to his caregivers.  Although Mother soothed K.E. when he cried at the end of one visit, he usually separated from the parents with no issues. He similarly cried and looked to his female caregiver for comfort and called both the parents and his caregivers "mommy and daddy."  Mother only attended two doctor's visits in the 22 months K.E. was out of her care, claiming she was not invited to any appointments.  She and Father only attended two early intervention sessions for K.E. and refused to authorize his caregivers to attend sessions in their absence, leading to an unnecessary delay for K.E.'s developmental services.  The court had to order the caregivers share educational and developmental decisionmaking rights with the parents so K.E. could get the services he needed.  The parents were invited to participate in sessions virtually but did not, while K.E. continued to make progress in all areas of development without his parents.

We conclude there is substantial evidence supporting the court's finding that K.E. did not have a substantial, positive, and emotional attachment to his parents.

C.    *Severance*

For the third element, "the court must decide whether it would be harmful to the child to sever the relationship and choose adoption.  Because terminating parental rights eliminates any legal basis for the parent or child to maintain the relationship, courts must assume that terminating parental rights terminates the relationship." (*Caden C., supra*, 11 Cal.5th at p. 633.) When the benefits of a stable, adoptive, permanent home outweigh the harm the child would experience from the loss of a continued parent-child relationship, the court should order adoption.  (*Id*. at p. 634.)  When deciding whether terminating parental rights would be detrimental to the child, the court is not comparing the parent's and custodial caregiver's attributes.

11

(*Ibid.*) Performing this analysis is a "subtle enterprise." (*Ibid*.) "In many cases, 'the strength and quality of the natural parent/child relationship' will substantially determine how detrimental it would be to lose that relationship, which must be weighed against the benefits of a new adoptive home." (*Ibid*.)

K.E. was equally happy to see his parents as his caregivers. He spent nearly the entirety of his young life out of his parents' care, having his needs met by the caregivers who wanted to provide him permanency and stability. By all accounts K.E. was thriving outside of his parents' care. He was well-adjusted, progressing in all areas and did not ask for his parents when they were not around. The record demonstrates there was no cognizable difference between K.E.'s life on days he visited them versus days he did not.

Because the court's findings were strongly supported by the evidence in this matter, we conclude it did not abuse its discretion when it determined that terminating parental rights was in K.E.'s best interests.

## DISPOSITION

The order terminating parental rights is affirmed.


McCONNELL, P. J.

WE CONCUR:


BUCHANAN, J.


CASTILLO, J.

12